**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Maura D. Corrigan

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 30, 2004**

NATIONAL WILDLIFE FEDERATION
& UPPER PENINSULA WILDLIFE
COUNCIL

    Plaintiffs-Appellees,

v                         No. 121890

CLEVELAND CLIFFS IRON COMPANY
& EMPIRE IRON MINING PARTNERSHIP

    Defendants-Appellants,

and

MICHIGAN DEPARTMENT OF ENVIRONMENTAL
QUALITY, and RUSSELL J. HARDING, Director
Of the Michigan Department of
Environmental Quality,

    Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

This case presents the question of whether plaintiffs have standing to bring a suit on behalf of their members under the Michigan Environmental Protection Act (MEPA), MCL 324.1701 *et seq.* We conclude that, under the particular circumstances of this case, plaintiffs have standing. We

affirm the decision of the Court of Appeals and remand this case to the trial court for further proceedings.

## I. Background

Defendant Cleveland Cliffs Iron Company (Cleveland Cliffs), in partnership with defendant Empire Iron Mining Partnership, planned to expand operations at the Empire Mine in Michigan's Upper Peninsula. Cleveland Cliffs applied for a permit through the Michigan Department of Environmental Quality (MDEQ), which held a public hearing to receive public comment. Eventually, the MDEQ issued the permit.

Plaintiffs, on behalf of their members, filed a petition for a contested case hearing with the MDEQ. The hearing referee held that plaintiffs lacked standing and dismissed the matter. Plaintiffs then appealed to the Marquette Circuit Court, which affirmed the referee's dismissal, and the Court of Appeals denied plaintiffs' application for leave to appeal.

Meanwhile, plaintiffs filed suit in Ingham Circuit Court (venue was later changed to Marquette County), including a count asserting a claim under MEPA.[1] Plaintiffs

---

[1] MCL 324.1701(1) provides:

(continued . . . .)

2

sought a temporary restraining order and a preliminary injunction of further mine expansion. The trial court denied the injunction, finding that plaintiffs lacked standing. Plaintiffs appealed, and the Court of Appeals reversed.[2] The Court analyzed the statute and found that it simply permitted "any person" to bring suit.

This Court granted leave, limited to the issue of "whether the Legislature can by statute confer standing on a party who does not satisfy the judicial test for standing. See *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726 [629 NW2d 900] (2001)."[3]

---

(continued . . . .)

      The attorney general or any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.

MCL 324.1704(1) provides:

      The court may grant temporary and permanent equitable relief or may impose conditions on the defendant that are required to protect the air, water, and other natural resources or the public trust in these resources from pollution, impairment, or destruction.

[2] *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, unpublished memorandum opinion, issued June 11, 2002 (Docket No. 232706).

[3] 468 Mich 944 (2003).

## II. Standard of Review

Whether a party has standing is a question of law that we review de novo.  *Lee, supra* at 734.

## III. Standing

First, contrary to the three concurring/dissenting opinions, one of which "disavows" its past support for *Lee, supra*, one of which reaffirms its past opposition to *Lee,* and one of which maintains its support for *Lee* while distinguishing it into nothingness, we reaffirm our support for the principles of standing set forth in *Lee,* and explain the importance of *Lee* for our constitutional system of separated powers and for the preservation of a judiciary operating within proper boundaries.[4]

---

[4] Justice WEAVER'S concurrence/dissent views the majority's ultimate determination concerning whether plaintiffs possess standing as a foregone conclusion in light of the majority's continued support for *Lee.*  It is wrong in this assertion.  In fact, we agree with the United States Supreme Court in *Lujan v Defenders of Wildlife*, 504 US 555, 578; 112 S Ct 2130; 119 L Ed 2d 351 (1992), which, although holding, as *Lee* does, that standing is of constitutional dimension, proceeds to observe that "[n]othing in this contradicts the principle that 'the . . . injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'"  This is affirmed in the concurring opinion of Justice Kennedy, joined by Justice Souter, in which they similarly observe, "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before, and we do not read the Court's opinion to suggest a contrary view."  *Id*. at 580.

4

The Michigan Constitution provides that the Legislature is to exercise the "legislative power" of the state, Const 1963, art 4, § 1, the Governor is to exercise the "executive power," Const 1963, art 5, § 1, and the judiciary is to exercise the "judicial power," Const 1963, art 6, § 1. The importance of these allocations of power is reaffirmed in Const 1963, art 3, § 2, which states:

> The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

By separating the powers of government, the framers of the Michigan Constitution sought to disperse governmental power and thereby to limit its exercise. "[T]here [is] no liberty . . . if the power of judging be not separated from the legislative and executive powers." Madison, The Federalist No 47.[5]

As a term that both defines the role of the judicial branch and limits the role of the legislative and executive branches, it is clear that the scope of the "judicial

---

[5] The separation of powers provision in each of Michigan's Constitutions is "in harmony with American political theory, the State government [being] divided into the three historic departments, the legislative, executive, and judicial . . . ." *Schwartz v Flint*, 426 Mich 295; 395 NW2d 678 (1986) (citation omitted).

power" is a matter of considerable constitutional significance. Given the final authority of the judicial branch to accord meaning to the language of the constitution, the term "judicial power" cannot ultimately be defined by the Legislature any more than "unreasonable searches and seizures"[6] or the "equal protection of the laws"[7] can ultimately be defined by the Legislature.[8]

The "judicial power," although not specifically defined in the Michigan Constitution, is distinct from both the legislative and executive powers. As former Justice THOMAS COOLEY has written:

> It is the province of judicial power [] to decide private disputes between or concerning persons; but of legislative power to regulate public concerns, and to make law for the benefit and welfare of the state. [Cooley, A Treatise on the Constitutional Limitations (Little, Brown & Co, 1886) at 92.]

The "judicial power" has traditionally been defined by a combination of considerations: the existence of a real dispute, or case or controversy; the avoidance of deciding

---

[6] Const 1963, art 1, § 11.

[7] Const 1963, art 1, § 2.

[8] In short, the deference that the concurrence/dissents purport to give to the Legislature is misplaced for the deference owed by this Court must first be to the constitution and only then to the coordinate branches of our state government.

hypothetical questions; the plaintiff who has suffered real harm; the existence of genuinely adverse parties; the sufficient ripeness or maturity of a case; the eschewing of cases that are moot at any stage of their litigation; the ability to issue proper forms of effective relief to a party; the avoidance of political questions or other non-justiciable controversies; the avoidance of unnecessary constitutional issues; and the emphasis upon proscriptive as opposed to prescriptive decision making.

Perhaps the most critical element of the "judicial power" has been its requirement of a genuine case or controversy between the parties, one in which there is a real, not a hypothetical, dispute, *Muskrat v United States*, 219 US 346; 31 S Ct 250; 55 L Ed 246 (1911), and one in which the plaintiff has suffered a "particularized" or personal injury. *Massachusetts v Mellon*, 262 US 447, 488; 43 S Ct 597; 67 L Ed 2d 1078 (1923). Such a "particularized" injury has generally required that a plaintiff must have suffered an injury distinct from that of the public generally. *Id*.

Absent a "particularized" injury, there would be little that would stand in the way of the judicial branch becoming intertwined in every matter of public debate. If a taxpayer, for example, opposed the closing of a tax

7

"loophole" by the Legislature, the legislation might be challenged in court.  If a taxpayer opposed an expenditure for a public building, that, too, might be challenged in court.  If a citizen disagreed with the manner in which agriculture officials were administering farm programs, or transportation officials' highway programs, or social services officials' welfare programs, those might all be challenged in court.  If a citizen opposed new prison disciplinary policies, that might be challenged in court.

In each instance, the result would be to have the judicial branch of government—the least politically accountable of the branches—deciding public policy, not in response to a real dispute in which a plaintiff had suffered a distinct and personal harm, but in response to a lawsuit from a citizen who had simply not prevailed in the representative processes of government.  To allow the judiciary to carry out its responsibilities in this manner is to misperceive the "judicial power," and to establish the judicial branch as a forum for giving parties who were unsuccessful in the legislative and executive processes simply another chance to prevail.  To allow this authority in the judiciary would also be to establish the judicial branch as first among equals, being permitted to monitor and supervise the other branches, and effectively

8

possessing a generalized commission to evaluate and second-guess the wisdom of their policies. As the United States Supreme Court observed in *Mellon*:

> The administration of any statute . . . is essentially a matter of public and not of individual concern. . . . The party who invokes the [judicial] power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with the people generally. . . . To [allow standing under a different understanding] would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which we plainly do not possess. [*Id.* at 487-489.]

When a broadening and redefinition of the "judicial power" comes not from the judiciary itself, usurping a power that does not belong to it, but from the Legislature purporting to confer new powers upon the judiciary, the exercise of such power is no less improper. The acceptance by one branch of the expansion of the powers of another branch is not dispositive in whether a constitutional power has been properly exercised. When the Legislature redefines the "judicial power" by expanding the realm of disputes cognizable by the judiciary, such expanded power on the part of the courts invariably comes at the expense of the executive, whose policies then become subject to the perpetual review and revision of the courts. As the United

9

States Supreme Court observed in *Lujan v Defenders of Wildlife*, 504 US 555, 576-577; 112 S Ct 2130; 119 L Ed 2d 351 (1992):

> Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of the Congress and the Chief Executive. . . . To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an "individual right" vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to "take Care that the Laws be faithfully executed," Art II, § 3. It would enable the courts, with the permission of Congress, "to assume a position of authority over the governmental acts of another and co-equal department," and to become "virtually continuing monitors of the wisdom and soundness of Executive action. We have always rejected that vision of our role . . . . [Citations omitted; emphasis in original.]

"We must as judges recall that, as Mr. Justice Holmes wisely observed, the other branches of Government 'are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.'" *Flast v Cohen*, 392 US 83, 131; 88 S Ct 1942; 20 L Ed 2d 947 (1968) (Harlan, J., dissenting), quoting *Missouri, Kansas & Texas R Co v May*, 194 US 267, 270; 24 S Ct 638; 48 L Ed 971 (1904).

Despite the remarkable statement in Justice WEAVER'S concurrence/dissent, *post* at 6 that the majority "expands the power of the judiciary," the exact opposite is true.

10

By its adherence to *Lee*, the majority opinion rejects a constitutional regime in which the judicial branch can be invested with extra-constitutional powers at the expense of the other branches, in particular the executive. One need only be a casual student of government to recognize the extraordinary rarity of an institution of government, such as this Court, choosing, on the basis of constitutional objection, *not* to exercise a power conferred upon it by another branch of government. It is impenetrable reasoning to equate such an *abnegation* of power with an *enhancement* of power.

The requirement of a genuine case or controversy as a precondition for the exercise of the "judicial power" is not a mere fine point of constitutional law. Rather, as Professor Alexander Bickel once wrote,

> [There are] sound reasons, grounded not only in theory but in the judicial experience of centuries, here and elsewhere, for believing that the hard, confining, and yet enlarging context of a real controversy leads to sounder and more enduring judgments. [Bickel, The Least Dangerous Branch (2d ed) (Yale University Press, 1986) at 115.]

Professor Bickel proceeded to observe that a contrary result in *Mellon*—one failing to recognize the importance of a plaintiff having suffered an "immediate, personal injury" in order to have standing to bring a lawsuit—would have "materially altered the function of judicial review and

seriously undermined any acceptable justifications for it."
*Id*. at 122.[9]  Justice Robert Jackson has similarly written
that the case or controversy requirement of the federal
constitution is "perhaps the most significant limitation
upon judicial power."  The Role of the Supreme Court in the
American System of Government (Harvard University Press,
1955) at 101.  And Justice Antonin Scalia has observed:

> The Judiciary would be, "from the nature of
> its functions, . . . the [department] least
> dangerous to the political rights of the
> constitution," not because its acts were subject
> to legislative correction, but because the
> binding effect of its acts was limited to
> particular cases and controversies.  [*Plaut v
> Spendthrift Farms*, 514 US 211, 223; 115 S Ct
> 1447; 131 L Ed 2d 328 (1995), quoting Hamilton,
> The Federalist, No 78.]

---

[9] Professor Kenneth Karst has written in the Oxford
Companion to the Supreme Court (Oxford University, 1992),
"By tying the court's power of constitutional
interpretation to their its power to decide cases, Marshall
founded the legitimacy of judicial review on its connection
to that case-deciding function."  *Id*. at 458.  Professor
Karst writes further:

> In general, when governmental officials act,
> only someone who is personally injured by those
> acts has standing to complain that they are
> unlawful.  Generally, a plaintiff does not
> satisfy the requirement of standing by alleging
> that governmental action was unconstitutional, if
> the only harm alleged has been caused by someone
> else, or if the illegality in question is only a
> violation of some other person's legal right.
> [*Id.*]

See also *Lujan, supra* at 562.

The concurrence/dissents, stating that they would overrule *Lee,* would erode one of the most significant barriers protecting the people from government by the judiciary. As Justice Harlan warned in his dissent in *Flast, supra* at 130, "There is every reason to fear that unrestricted public actions might well alter the allocation of authority among the three branches of the Federal Government." In *United States v Richardson*, 418 US 166, 188; 94 S Ct 2940; 41 L Ed 2d 678 (1974), Justice Powell observed, "[r]elaxation of standing requirements is directly related to the expansion of judicial power . . . significantly alter[ing] the allocation of power at the national level, with a shift away from a democratic form of government." And in *Lewis v Casey*, 518 US 343, 349-350; 116 S Ct 2174; 135 L Ed 2d 606 (1996), the Supreme Court opined:

> It is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution. . . . [T]he distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly.

When courts exceed the "judicial power," the interests of some other branch of government necessarily must be

13

implicated and, as already observed, these normally will be the interests of the executive branch. As then-Professor, later-Justice Scalia put it:

> [T]he law of standing roughly restricts courts to their traditional undemocratic role of protecting individuals and minorities against impositions of majorities, and excludes them from the even more undemocratic role of prescribing how the other two branches should function in order to serve the interests *of the majority itself*. [Scalia, *The doctrine of standing as an essential element of the separation of powers*, 17 Suffolk U L Rev 881, 894 (1983).]

Professor Kenneth Karst has described some of the practical implications of relaxing the case or controversy requirement in greater detail:

> These developments in jurisdictional doctrine are representative of the emergence of what Abram Chayes has called "public law" litigation. In the traditional common-law model of a lawsuit there is one plaintiff and one defendant; the plaintiff personally initiates the lawsuit, and on both sides the parties control the conduct of the case; the parties' dispute concerns legal obligations founded on facts in the past; the remedies requested are closely fitted to the specific rights of the plaintiff; and the case culminates in a single trial and a single judgment. If, however, a class of plaintiffs sues a governmental institution such as a school board or the managers of a state hospital or prison, the lawsuit is likely to diverge from the common-law model. Public interest lawyers may invent the lawsuit and then go out to find some plaintiffs. . . . The whole process has a "legislative" or even "administrative" look. The interests of the particular parties in whose name the suit was filed seem secondary. [*Oxford* Companion to the Supreme Court, *supra* at 458-459.]

14

In this process, the authority of the executive branch is replaced by the authority of the judiciary, public policy decisions increasingly come to be made exclusively by lawyers in robes, the negotiation and compromise and give-and-take of the representative processes is replaced by the absolutist "rights" analyses of individual judges, and local control of public decision making comes increasingly to be replaced by unaccountable judicial decision making. One committed to a governmental system in which most important public policy decisions are eventually made by the courts, and in which the representative processes increasingly become little more than a prelude to judicial decision making, would, almost certainly, begin by dismantling longstanding and traditional preconditions to the exercise of the "judicial power" reflected in the concept of standing.[10]

Thus, we continue to adhere to *Lee*, and conclude that *Lee* was correct in its holding that questions of standing implicate the constitutional separation of powers, and that

---

[10] "This explicit requirement [of a case or controversy] is the constitutional key to understanding the forms and limits of judicial power." McDowell, Curbing the Courts (Louisiana State Press, 1988) at 195. Standing was restricted to certain forms "so as not to allow the judges a 'roving commission to do good.'" *Id*. at 172.

forsaking this proposition "would imperil the constitutional architecture . . . ." *Id*. at 735. As the United States Supreme Court observed in *Allen v Wright*, 468 US 737, 751-752; 104 S Ct 3315; 82 L Ed 2d 556 (1984):

> The requirement of standing . . . has a core component derived directly from the Constitution.
>
> * * *
>
> [T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers. . . . [Q]uestions . . . relevant to the standing inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only "in the last resort, and as a necessity," and only when adjudication is "consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process." [Quoting *Chicago & Grand Trunk R Co v Wellman,* 143 US 339, 345; 12 S Ct 400; 36 L Ed 176 (1892) and *Flast, supra* at 97.]

See also *Lujan*, *supra* at 561.

If the Legislature were permitted at its discretion to confer jurisdiction upon this Court unmoored from any genuine case or controversy, this Court would be transformed in character and empowered to decide matters that have historically been within the purview of the Governor and the executive branch. If there is dispute over the manner in which the Governor is enforcing or administering a law, such dispute, in the normal course, must be resolved through the executive process. If there are citizens who believe the Governor is wrongfully or

16

inadequately enforcing or administering the state's consumer protection or occupational safety or worker's compensation or revenue laws, it is their right to petition or lobby the Governor in order to alter these policies. It is also the right of such citizens to petition or lobby the Legislature in order to cause them to alter these laws. Finally, of course, it is the right of citizens to participate in the channels of public debate, and in the political processes, in order to influence public policies, or to place in public office persons who more accommodating to their points of view. Unless there is an individual who has personally been injured by the Governor's enforcement or administration of these laws, it is not normally the role of the judicial branch to monitor the work of the executive and determine whether it is carrying out its responsibilities in an acceptable fashion. That the Legislature—perhaps even with the acquiescence of the executive—has purported to impose this role upon the judicial branch does not alter this constitutional reality. See, e.g., *Hayburn's Case*, 2 US (2 Dall) 409; 1 L Ed 436 (1792), in which the United States Supreme Court refused to accept as part of its "judicial power" the responsibility imposed upon it by the Congress of examining the pension claims of Revolutionary War veterans. The Court concluded

that the Congress could not "constitutionally assign to the Judiciary any duties, but such as are properly judicial, and to be performed in a judicial manner," *id*. at 410; see also *Osborn v Bank of United States*, 22 US (9 Wheat) 738; 6 L Ed 204 (1824).[11]

Justice WEAVER'S efforts to distinguish between the United States and the Michigan constitutions in defining the "judicial power" are unconvincing. She misapprehends both of these constitutions.

---

[11] Almost certainly, the analyses of the concurrence/dissents invite further efforts to redefine the "judicial power" in questionable ways. See, e.g., *Plaut v Spendthrift Farms*, *supra*, in which the Congress sought to require the Supreme Court to retroactively reopen final judgments, judgments that were apparently unpopular with the Congress. Two justices, Stevens and Ginsburg, in dissent indicated their willingness to accept this modified conception of the "judicial power." "We must remember that the machinery of government would not work if it were not allowed a little play in its joints." *Id*. at 266 (Stevens, J., dissenting), quoting *Bain Peanut Co v Pinson*, 282 US 499, 501; 51 S Ct 228; 75 L Ed 482 (1931). Nor, when the "judicial power" becomes a mere function of legislative determination, is there any guarantee that this authority will only be broadened. The concurrence/dissents have no principled way of addressing efforts by the legislative branch to contract, rather than to expand, the "judicial power." In this regard, see the brief amicus curiae of Joseph L. Sax at 9 in which Professor Sax appears to argue that Const 1963, art 6, § 13, conferring jurisdiction upon the circuit courts "in accordance with rules of the Supreme Court," enables this Court to confer jurisdiction upon the circuit court through our rules without regard to the boundaries of the "judicial power."

In the first section of the judicial articles of the federal and the Michigan constitutions, their respective judicial branches are vested simply with the "judicial power." The federal constitution states, "The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." US Const, art III, § 1. The Michigan Constitution states, "The judicial power of the state is vested exclusively in one court of justice . . . ." Const 1963, art 6, § 1. The purpose of these sections is to define—equivalently to what has been done earlier in the first sections of the legislative and executive articles—the scope of authority of the judicial branch. That authority consists exclusively of the "judicial power."

Nothing further is said in either of these constitutions specifically defining the "judicial power," with three exceptions in the Michigan Constitution, each of which undercut the argument of the concurrence/dissents that there is no fixed meaning to the "judicial power" and that it is susceptible to constant redefinition at the

discretion of the other branches.[12]  Const 1963, art 3, § 8

allows either house of the Legislature to request the Court

to issue an "advisory opinion" on the "constitutionality of

legislation"; Const 1963, art 9, § 32 confers upon "any

taxpayer of the state" standing to bring suit to enforce

the provisions of the so-called Headlee Amendment; and

Const 1963, art 11, § 5 empowers "any citizen of the state"

to bring injunctive or mandamus proceedings to enforce the

civil service laws of the state.  To the extent that the

people of Michigan, through their constitution, have chosen

to confer upon the judiciary three specific authorities

potentially beyond the traditional "judicial power," it

seems unlikely that the people intended that any other such

nontraditional authority could simply be incorporated as

---

[12] If the "judicial power" can be redefined at the behest of the legislative or executive branches, one wonders why, under the analyses of the concurrence/dissents, it cannot also be redefined at the behest of the judicial branch itself, for why should that branch *alone* be disabled in its ability to give new meaning to this constitutional term?  There is no principled reason from the perspective of the concurrence/dissents why a court could not expand upon its own authority by disregarding traditional restraints upon the exercise of the "judicial power."  By transforming the "judicial power" from a concept of constitutional stature into a mere prudential concept, to be decided  absent any readily-discernible standards, the concurrence/dissents would give considerable impetus to a more powerful judicial branch at the expense of coordinate branches of government.

20

part of the "judicial power" by a simple majority of the Legislature.[13]

The concurrence/dissents find relevant that the federal constitution diverges from the Michigan Constitution where, in art III, § 2, it states:

> The judicial Power shall extend to all *Cases*, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all *Cases* affecting Ambassadors, other public Ministers and Consuls;—to all *Cases* of admiralty and maritime Jurisdiction;—to *Controversies* to which the United States shall be a Party;—to *Controversies* between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign states, Citizens or Subjects. [Emphasis added.][14]

Contrary to what is implicit in the concurrence/dissents, this is not a definitional provision that seeks to give meaning to the "judicial power." Rather, art III, § 2 is a provision defining the *limited* judicial power of the

---

[13] Justice KELLY interprets these provisions, conferring broader-than-traditional standing in *specific* areas of the law, as conferring broader-than-traditional standing in *any* area of the law in which the legislature chooses to confer such standing. *Post* at 7, n 5. The majority draws exactly the opposite inference from these provisions.

[14] Although it is not relevant to the instant analysis, several of these provisions have been subsequently rendered effectively null and void by the Eleventh Amendment.

21

federal judiciary, in contrast to the *plenary* judicial power of the state judiciary. The respective legislative articles of the two constitutions are analogous to the judicial articles: the legislative article of the Michigan Constitution does not purport to define the authority of its Legislature (for example, nothing is said therein concerning its authority over marriage, divorce, child custody, child support, alimony, or foster care), while the legislative article of the federal constitution *does* affirmatively confer authority upon the Congress, article I, § 8. The state judicial power, as with the state legislative power, is plenary, requiring no affirmative grant of authority in the state constitution. The federal judicial power, on the other hand, as with the federal legislative power, is limited. Such power is exclusively a function, or a creation, of the federal constitution, and, therefore, must be affirmatively set forth. In similar fashion, the federal judicial power must also be affirmatively set forth, for it is also a function, or creation, of the federal constitution. Thus, US Const, art III, § 2 does not *define* the "judicial power"; rather it defines what *part* of the "judicial power" within the United States belongs to the federal judiciary, with the remaining part belonging exclusively to the state judiciary. That

22

art III, § 2 variously employs the terms "cases" or "controversies" is not to confer a particular meaning upon the "judicial power," but merely is to employ words that are necessary to the syntax of allocating the "judicial power" between the federal and state governments.[15] The concurrence/dissents would confuse the allocation of a power with its definition, and would thereby define the federal "judicial power" in the narrowest possible manner by limiting it through reference *alone* to the existence of a "case."[16] Even from the perspective of the

---

[15] "In the Constitution of the United States, we perceive, not the express creation of a judicial power, but the recognition of it as a necessary part of the government . . . ." Rawle, A View of the Constitution of the United States (Nicken, Philadelphia, 1829) ch 21, pp 199-200.

[16] Although Madison suggested at the constitutional convention that the federal "judicial power" ought to be "limited to cases of a Judiciary Nature," II Farrand, Records of the Federal Convention of 1787 (Yale University, 1966) at 430, there is remarkably little discussion in the Federalist Papers, the records of the convention, or in other constitutional source materials concerning the precise meaning of the "judicial power." Similarly, there is virtually no discussion concerning the meaning of this term in the "Official Record" of the Michigan constitutional convention of 1961, or in source materials surrounding Michigan's earlier constitutions. We attribute this to the fact that the term was sufficiently well understood by scholars, lawyers, judges, and even laymen of the time as not to require further elucidation. No one would have understood the "judicial power" to constitute an essentially empty constitutional vessel into which majorities of the Legislature were free to pour in novel meanings.

concurrence/dissents, is there *no* more permanent aspect of the "judicial power" than that it pertain to a "case"?

In fact, the "judicial power" in the Michigan Constitution, with the several exceptions enumerated above, is the same "judicial power" as in the federal constitution,[17] and it is the same "judicial power" that has informed the practice of both federal and state judiciaries for centuries.[18] These historical principles were recognized by *Lee*, and we continue to adhere to them today.[19]

---

[17] In accord, *Daniels v People*, 6 Mich 381, 388 (1859); *Sutherland v Governor*, 29 Mich 320, 324 (1874); *Risser v Hoyt*, 53 Mich 185, 193; 18 NW 611 (1884); *Johnson v Kramer Bros Freight Lines, Inc*, 357 Mich 254, 258; 98 NW2d 586 (1959); House Speaker v State Admin Bd, 441 Mich 547, 554; 495 NW2d 539 (1993), all cited in *Lee*, *supra* at 738.

[18] One constitutional framer observed, "The third great division of the powers of government is the judicial authority. . . . The judicial authority consists in applying, according to the principles of right and justice, the constitution and laws to facts and transactions in cases, in which the manner or principles of this application are disputed by the parties interested in them." James Wilson, 1 Lectures on Law, pp 296-297 (1791).

[19] With all due respect, Justice WEAVER, *post* at 5, is breathtakingly mistaken in peremptorily describing as a "judge-made standing test" an element of the "judicial power" that would have been viewed by the framers of both the federal and the Michigan constitutions as essential to the separation of powers, itself perhaps the most essential pillar of our constitutional structure.

At the same time that the concurring/dissenting justices extol their own commitment to preservation of the natural environment, they might well devote equal attention to the preservation of our constitutional environment. By their diminishment of a traditional check and balance upon the exercise of the "judicial power," the concurring/dissenting justices would, if their position were ever to gain a majority, inflict considerable injury upon our system of separation of powers and the rule of law that it has produced.

## IV. APPLICATION

At a minimum, standing consists of three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . traceable to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." [*Lee, supra* at 739, quoting *Lujan, supra* at 560-561.]

Plaintiffs seek injunctive relief on behalf of their members. Nonprofit organizations, such as plaintiffs, have standing to bring suit in the interest of their members where such members would have standing as individual

25

plaintiffs. See generally *Trout Unlimited, Muskegon White River Chapter v White Cloud*, 195 Mich App 343, 348; 489 NW2d 188 (1992); *Karrip v Cannon Twp*, 115 Mich App 726, 733; 321 NW2d 690 (1982). Thus, plaintiffs must allege that their members suffered either an actual injury or an "imminent" injury. *Lee, supra* at 739-740, citing *Lujan, supra*. The United States Supreme Court in *Friends of the Earth, Inc v Laidlaw Environmental Services (TOC), Inc*, 528 US 167, 183; 120 S Ct 693; 145 L Ed 2d 610 (2000), found "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity" (citation omitted). The Court continued, contrasting the allegations with those found insufficient in *Lujan* and *Los Angeles v Lyons*, 461 US 95; 103 S Ct 1660; 75 L Ed 2d 675 (1983) (regarding anticipated use of chokeholds by the LAPD):

> [W]e see nothing "improbable" about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms. The proposition is entirely reasonable, the District Court found it was true in this case, and *that is enough for injury in fact.* [*Friends of the Earth, Inc, supra* at 184-185, (emphasis added).]

Plaintiffs here provided affidavits from three individuals, members of their organizations who reside near the mine, who alleged they bird-watched, canoed, bicycled, hiked, skied, fished, and farmed in the area, they plan to continue to do so as long as the area remains unspoiled, and they are "concerned" that the mine expansion will irreparably harm their recreational and aesthetic enjoyment of the area. One affiant also alleged that his well, on property adjacent to the mine, was almost dry and he had to construct a new, deeper well due to the local aquifer dropping too low. He alleged this was because of defendants' mining activities. These affidavits are nearly identical to those found adequate in *Laidlaw*, and we find they sufficiently meet the test for standing we set forth in *Lee*.

However, we note that plaintiffs may not simply rely on these affidavits throughout the entire proceedings to prove that standing exists. Subject matter jurisdiction is a matter that may be raised at any time. MCR 2.116(D)(3). The United States Supreme Court explained the requirements in *Lujan, supra* at 561:

> The party invoking federal jurisdiction bears the burden of establishing these elements [i.e., injury in fact, causation, redressibility]. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must

27

be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presume that general allegations embrace those specific facts that are necessary to support the claim." In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial." [Citations omitted.]

Thus, a plaintiff must include in the pleadings "general factual allegations" that injury will result from the defendant's conduct. If the defendant brings a motion for summary disposition, the plaintiff must further support the allegations of injury with documentation, just as he has to support the other allegations that make up his claim. Finally, when the matter comes to trial, the plaintiff must sufficiently support his claim, including allegations of injury, to meet his burden of proof.[20]

---

[20] It was with regard to these last two steps that Justices Scalia and Thomas dissented from the majority in *Laidlaw*. They would have found that although "[g]eneral allegations of injury may suffice at the pleading stage, . . . at summary judgment plaintiffs must set forth 'specific facts' to support their claims." *Friends of the Earth, Inc, supra* at 198.

28

In this case, the response to defendants' motion is met by the affidavit of plaintiff's expert, Christopher Grobbel. Included in that document is an explanation of the expected effect on groundwater flow and recharge rate; effects on stream flow and water quality; and the expected effects on birds, fish, and plants resulting from the planned extensive habitat destruction. Grobbel's affidavit serves to provide the necessary factual support for the individuals' averred injuries. Plaintiffs will, of course, be required at trial to meet their burden of proof regarding the alleged injuries and the alleged effects of the expansion plans.

Because we hold that plaintiffs have standing without regard to MCL 324.1701(1), we find it unnecessary to reach the constitutionality of § 1701(1).

### V. Response to Concurrence/Dissents

Justice WEAVER expresses dissatisfaction with the fact that plaintiffs have been found by the majority to possess standing to pursue their MEPA claims, but not on the constitutional grounds that she would prefer. It seems that it is not enough that plaintiffs prevail, but that their victory must be predicated, not upon the resolution of a mere case or controversy, but upon the constitution itself. The majority concludes that it is unnecessary in

29

this case to resolve a constitutional issue where the case can be fully resolved on nonconstitutional grounds. Just as respect for the requirements of standing is an essential element of the responsible exercise of the "judicial power," so too is respect for the need to address constitutional issues only where necessary. Given its very different views of standing, it is understandable why Justice WEAVER, unlike this majority, would find the constitutional question here to be an easy one. However, notwithstanding the merits of our respective views on standing, constitutional issues—whether easy or difficult— are to be avoided where a case can be resolved adequately on non-constitutional grounds.[21]

---

[21] As Justice COOLEY has remarked,

> While the courts cannot shun the discussion of constitutional questions when fairly presented, they will not go out of their way to find such topics. They will not seek to draw in such weighty matters collaterally, nor on trivial occasions. It is both more proper and more respectful to a coordinate department to discuss constitutional questions only when that is the very *lis mota*. Thus presented and determined, the decision carries a weight with it to which no extra-judicial disquisition is entitled. In any case, therefore, where a constitutional questions is raised, though it may be legitimately presented by the record, yet if the record also presents some other and clear ground upon which the court may rest its judgment, and thereby render the constitutional question immaterial to the case, the court will take that course, and
>                                        (continued . . . .)

Several other aspects of Justice WEAVER'S opinion deserve comment, as does the opinion of Justice KELLY:

(1) Justice WEAVER asserts that, despite *Lee,* Michigan's standing requirement is not constitutional, but rather is nothing more than "judge-made" law. *Post* at 4 n 4.[22] It is hard to know what to make of this dismisssive observation. Justice WEAVER does not explain why *Lee* constitutes "judge-

(continued . . . .)
> leave the question of constitutional power to be passed upon when a case arises which cannot be otherwise disposed of, and which consequently renders a decision upon such question necessary. [Constitutional Limitations, ch 7, § 2 (1868) (citations omitted).]

See also *Weimer v Bunbury*, 30 Mich 201, 218 (1874); *People v Quider*, 172 Mich 280, 289; 137 NW 546 (1912); *J & J Constr Co v Bricklayers & Allied Craftsmen*, 468 Mich 722, 733-734; 664 NW2d 728 (2003). Justice WEAVER characterizes judicial restraint of the type described by Justice COOLEY, and honored by judges from time immemorial, as "dodging" the issue. *Post* at 30.

[22] It is difficult to reconcile Justice WEAVER'S position that there is no constitutional limitation on what constitutes the "judicial power" with her concurring statement in *In re Certified Question (Kenneth Henes v Continental Biomass Industries, Inc)*, 468 Mich 109, 121; 659 NW2d 597 (2003), in which she asserts that she would decline to answer a certified question presented in that case because the court rule pertaining to certified questions "represents an *unconstitutional* expansion of judicial power." (Emphasis added.) She further observed in *Certified Question* that, "it is proper to examine the common-law understanding of 'judicial power' in order to determine . . . the scope of that power . . . . '[J]udicial power' is 'the power to hear and determine controversies between adverse parties, and questions in litigation.'" (Citations omitted.) On this basis, she then concludes that the court rule is unconstitutional.

made" law any more than any other interpretation of the constitution, except that she disagrees with *Lee*. Whatever "judge-made" law is, *Lee* does not constitute "judge-made" law any more than *Marbury v Madison*, 5 US (1 Cranch) 137; 2 L Ed 60 (1803); *McCulloch v Maryland*, 17 US 316; 5 L Ed 579 (1819), or *Brown v Bd of Ed*, 347 US 483; 74 S Ct 686; 98 L Ed 2d 873 (1954). Some judicial opinions interpreting the Constitution, of course, may be more persuasive than others, but all are presumed to articulate the meaning of the constitution rather than the personal views of a judge. In *Lee*, this Court, expounding upon the constitutional status of standing in Michigan, relied upon federal and state judicial precedents, as well as historical understandings, and in the instant opinion, we elaborate upon this analysis by looking to the meaning of the "judicial power" under the constitution. While Justice WEAVER is certainly free to disagree with the majority's analysis, and while there is room for reasonable debate, the majority's constitutional holding is no more properly characterized as "judge-made" law than any other interpretation of the constitution. What constitutes the "judicial power," just as what constitutes "equal protection of the laws," "due process," and "cruel and unusual punishment," cannot be determined by some

mechanical process, but must be given *meaning* by judges attempting in good faith to understand the intentions of those who ratified these provisions. If constitutional interpretations with which she disagrees are mere "judge-made" law, how would the Justice WEAVER characterize interpretations with which she agrees, perhaps even those interpretations produced by her own pen?

(2) Justice WEAVER asserts that the majority discussion of standing is, by virtue of Const 1963, art 4, § 52, "irrelevant to the important questions of Michigan law presented in this case." *Post* at 2 n 1. Art 4, § 52 states, in part, "The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction." Justice WEAVER contends that, pursuant to this provision, "the people of Michigan have required that the Legislature provide for the protection of Michigan's natural resources. The Legislature properly acted in fulfillment of its constitutional responsibility through enactment of the MEPA citizen-suit provision . . .," and thus any constitutional standing concerns are irrelevant where MEPA is concerned. *Post* at 2.

What Justice WEAVER overlooks, however, is that there are many requirements that are imposed upon the Legislature by the constitution. For example:

-- The Legislature "shall implement" legislation protecting civil rights. Const 1963, art 1, § 2.

-- The Legislature "shall enact" laws to preserve the integrity of elections. Const 1963, art 2, § 4.

-- The Legislature "shall implement" the rules of initiatives and referendums in Michigan. Const 1963, art 2, § 9.

-- The Legislature "shall further implement" rules against conflicts-of-interests by legislators. Const 1963, art 4, § 10.

-- The Legislature "shall implement" the provisions of the Headlee Amendment pertaining to tax limitations. Const 1963, art 9, § 34.[23]

While undoubtedly making clear what some of the priorities and obligations of government are, these constitutional provisions do not state that the Legislature may pursue these goals, as Justice WEAVER implies, *by whatever means*. Rather, it is implicit in these provisions that the Legislature is to pursue these goals *by appropriate means*.

---

[23] See also Const 1963, art 2, § 1; art 4, §§ 12, 15, 51, 53; art 5, §§ 10, 12, 14, 15, 17, 18, 20; art 6, § 25; art 7, §§ 20, 21, 28; art 8, §§ 2, 4, 7, 9; art 9, §§ 1, 3, 5, 21, 35, 35a; art 10, § 5.

The Legislature cannot pursue the objects of these "shall do" provisions by methods that are otherwise unconstitutional. Does Justice WEAVER think that the Legislature is empowered under art 4, § 52 to do *anything at all* so long as it is done ostensibly with the goal of protecting the environment? Can it disregard due process in the criminal prosecution of environmental polluters? Can it disregard the requirements of just compensation in taking property in order to construct a wilderness area? Can it ignore the prohibition against ex post facto laws by criminalizing conduct that was legal at the time it took place?

Moreover, can the Legislature, under art 1, § 2 (requiring it to implement civil rights laws), expand the "judicial power" by enacting laws allowing "any person" to sue for a civil rights violation committed against "any other person," even if the actual victim chooses not to sue? Can the Legislature, under art 9, § 34 (requiring it to implement tax-limitation provisions), expand the "judicial power" by authorizing "any person" in Monroe or Hillsdale to sue to prevent a tax increase in Marquette or Escanaba? Can the Legislature, under art 2, § 4 (requiring it to enact election laws), expand the "judicial power" by authorizing "any person" in Kalamazoo or Battle Creek to

35

sue over ballot disagreements in the Alpena city council race?

While clearly identifying an important priority of government, art 4, § 52 does not authorize the Legislature to ignore all other provisions of the constitution in enacting laws to protect the environment. At least to date, the "judicial power" in Michigan has been exercised only on behalf of plaintiffs who have suffered actual and particularized injuries.

(3) Justice WEAVER repeatedly asserts that this Court, in exercising the "judicial power," must act in conformity with MEPA. *Post* at 4, 6, 22. In this assertion, she fundamentally misapprehends the duties of the judicial branch. As the Michigan Constitution makes clear, the duty of the judiciary is to exercise the "judicial power," art 6, § 1, and, in so doing, to respect the separation of powers, art 3, § 2. While as a *general proposition*, the proper exercise of the "judicial power" will obligate the judiciary to give faithful effect to the words of the Legislature—for it is the latter that exercises the "legislative power," not the judiciary—such effect cannot properly be given when to do so would contravene the constitution itself. Just as the judicial branch owes deference to the legislative branch when the "legislative

36

power" is being exercised, so too does the legislative branch owe deference to the judicial branch when the exercise of the "judicial power" is implicated. Even with the acquiescence of the legislative and executive branches, the judicial branch cannot arrogate to itself governmental authority that is beyond the scope of the "judicial power" under the constitution. See *Marbury v Madison*, *supra*. The "textual" approach of the concurring/dissenting justice is a caricatured textualism, in which the Legislature is empowered to act *beyond* its authority in conferring powers upon other branches that are also *beyond* their authority.[24]

In the final analysis, the constitutional responsibility of the judiciary is to act in accordance with the constitution and its system of separated powers, by exercising the judicial power and only the judicial power.[25]

---

[24] One assumes, for example, that the concurring/dissenting justice would recognize the impropriety of the Legislature purporting to confer authority upon the executive branch to exercise the "executive power" to condemn property for a "non-public" use, see *Wayne Co v Hathcock*, 471 Mich ___; ___ NW2d ___ (2004), or of the Legislature purporting to exercise the "legislative power" by pardoning criminals.

[25] The concurring/dissenting justice's repeated references to the "people's mandate" (or the "will of the people") in MEPA, must, of course, be read in connection with the ultimate "people's mandate," which is that found

(continued . . . .)

(4) Justice WEAVER asserts that the majority's decision "overrules 30 years of Michigan case law that held that the Legislature meant what it said when it allowed 'any person' to bring an action in circuit court to protect natural resources from actual or likely harm." *Post* at 3. In support of this proposition, she cites *Eyde v Michigan*, 393 Mich 453, 454; 225 NW2d 1 (1975), and *Ray v Mason Co Drain Comm'r*, 393 Mich 294, 305; 224 NW2d 883 (1975). However, neither of these decisions, issued in the aftermath of MEPA's passage, offer the slightest support for the concurrence/dissent's conclusion. Unlike the present case, neither *Eyde* nor *Ray* concerned the issue of standing and neither involved plaintiffs concerning whom there was any question of standing. Rather, in *Eyde* and *Ray*, this Court did nothing more than describe, in passing, the substance

---

(continued . . . .)
in their constitution. There, "we the people" have created for themselves a government in which, in at least four separate provisions, they have set forth as clearly as possible that the boundaries of governmental power are to be taken seriously. Const 1963, art 3, § 2; art 4, § 1; art 5, § 1; art 6, § 1.

Further, the concurring/dissenting justice seems considerably less enthusiastic about deferring to the "people's mandate" in the context of the Sand Dune Mining Act, see *infra* at 52-54*; Preserve the Dunes v Department of Environmental Quality*, 471 Mich ____, ___; ____ NW2d ____ (2004), in which the "people," through their Legislature, have also determined that limited mining should be permitted near Michigan's sand dunes.

of the various provisions of the new act. Such statements do not even rise to the level of dictum since in neither *Eyde* nor *Ray* did this Court even purport to comment upon the propriety of the standing provision, much less comment upon it approvingly. The statements in *Eyde* and *Ray* make no pretense of being statements of law; they are merely passing, but accurate, descriptions of what was contained in the new act. Because of what these statements constituted—mere descriptions of provisions of an act not then in dispute—it is understandable why neither *Eyde* nor *Ray* set forth any analysis of the meaning of these provisions, any analysis of their constitutional implications, any analysis of relevant judicial precedents, and even any acknowledgment of relevant judicial precedents. See *Smith v Globe Life Ins Co*, 460 Mich 446, 461 n 7; 597 NW2d 28 (1999).[26] Yet, it is on the basis of *Eyde* and *Ray* that Justice WEAVER identifies "30 years of Michigan case law" in support of the proposition that matters of standing do not implicate the Constitution.[27]

---

[26] It is for these same reasons that we find unpersuasive the additional cases cited by Justice WEAVER in support of her assertion that the majority is overruling "30 years of Michigan case law" concerning standing under MEPA. *Post* at 3 n 3.

[27] Other references by the concurring/dissenting justice to Michigan case-law are equally unavailing in

(continued . . . .)

(5) Justice WEAVER accuses the majority of "expand[ing] the power of the judiciary at the expense of the Legislature . . . ." *Post* at 5-6. This accusation turns reality upon its head. It is akin to saying that President Washington was expanding his own powers by turning down congressional invitations to become King. Rather than *expanding* its powers, this Court, by questioning the authority of the Legislature to confer broader powers upon it, and thereby to expand the "judicial power," is *resisting* an expansion of power—not an everyday occurrence in the annals of modern government.

By ensuring that the "judicial power" not be improperly expanded by the Legislature, and the "executive power" not be improperly contracted, this Court is defending the constitutional structure. In similar fashion, the United States Supreme Court in *Marbury v Madison, supra,* concluded that a congressional grant of

---

(continued . . . .)
support of this conclusion. In *Detroit Fire Fighters As'n v Detroit*, 449 Mich 629, 643; 537 NW2d 436 (1995) (RILEY, J., concurring), for example, only a single justice of this Court, in pure dictum, indicated support for the proposition that that Michigan standing requirements are based on prudential rather than constitutional concerns. *Post* at 10. *House Speaker, supra* at 554, is similarly inapt.

authority to the Court to issue writs of mandamus could not be exercised because the constitution did not allow the original jurisdiction of that Court to be expanded by mere statute. As Chief Justice MARSHALL stated, "It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it." *Id*. at 177. The Michigan Constitution grants this Court the "judicial power"—nothing more and nothing less—and neither the Legislature nor this Court itself possess the authority to redefine these limits.[28]

---

[28] In at least one respect—in her observation that "judicial activism can be disguised as judicial restraint," *post* at 32—we agree with the concurring/dissenting justice. Employing the language of judicial restraint, she would summarily jettison in the name of an (understandably) popular cause one of the most enduring bulwarks against judicial activism, the requirement of standing—the requirement that that courts decide only actual cases and controversies between real parties with genuinely adverse interests. By dismantling this historical constraint upon the courts, she would allow the judicial branch—the least accountable and least representative branch of government—to become potentially involved in a sharply expanded range of public policy disputes. To many Americans of a wide range of political and jurisprudential views, this would exacerbate the recent trend in which the constitutional equilibrium between the judiciary, and the other branches of government, has become increasingly imbalanced and distorted in favor of the former.

The majority would restrict the judiciary to its traditional role of resolving actual cases and controversies. The concurring/dissenting justice potentially would allow any person opposed to some aspect of governmental policy, i.e., most persons, to sue in order

(continued . . . .)

41

(6) In attempting to understand Justice KELLY's opinion, it is important to recognize that she takes great care to proclaim, *post* at 2 n 1, that, despite all contrary appearances, she is not "*en toto*" overruling *Lee*. The effect of this analysis on the part of the concurring justice is to allow her to enjoy the freedom to discard traditional principles of standing when it is useful to do so, as in this case, and then to reassert such principles, per *Lee*, when that is equally useful. The concurring justice's decisionmaking is standardless and inconsistent with a predictable rule of law.[29]

---

(continued . . . .)
to substitute their personal preferences of what governmental policy ought to be for the policies actually produced by the representative processes of government. The concurring/dissenting justice would take advantage of the relative lack of public understanding of how traditional standing precepts maintain the constitutional separation of powers to self-characterize her position as one of "judicial restraint," notwithstanding her support for eliminating one of the fundamental underpinnings of genuine judicial restraint. Almost certainly, if the concurring/dissenting justice's position on standing were ever to prevail in Michigan, or nationally, the judicial branch of government would quickly become a far more dominant force, and the representative and accountable branches of government would become far less relevant.

[29] Doubtless in the next case—or at least in the next case in which she is less enthusiastic about "any person" suing "any person" for anything at all—the concurring justice will opine that, unlike in the instant case, the plaintiffs in *that* case do not have the same "strong personal manifestations, called 'passive use' or 'standby value' interests," *post* at 17, that will ensure the same
(continued . . . .)

42

(7) Justice KELLY sets forth a torrent of novel constitutional propositions in her opinion whose principal purpose apparently is to justify the abandonment of traditional principles of standing ("to open wide the courthouse doors")—at least in the realm of environmental law. The people will have to wait to see whether the concurring justice is as amenable to the abolition of standing in other areas of the law. A few of the more creative propositions of constitutional law that inhabit her opinion:

> -- The "judicial power," although it may require an individualized injury in order to bring a *federal* lawsuit, does not require the same to bring a *state* lawsuit. *Post* at 10-11. Although Justice KELLY correctly remarks upon the differing nature of the federal and state governments, she fails to demonstrate why these differences have any relevance at all for her conclusion that the "judicial power" should be understood differently within these systems.

> -- The subject-matter jurisdiction of state courts is "plenary," and, therefore, the state "judicial power" is "plenary." *Post* at 11-12. That there may be plenary state authority "to address any social problem that threatens the public welfare" does not mean that the "judicial power" encompasses all such authority. *Id*. at 11.

---

(continued . . . .)
"sincere and vigorous" advocacy as here. "These interests ensure that environmental suits are vigorously pursued by people with a strong personal belief in their claim." *Id*. at 17.

-- The "people" only have the power to "execute" the environmental laws when they are permitted to sue in court. *Post* at 5. One might have thought that it was the executive branch's responsibility to "execute" the laws, and that they did so on behalf of the "people."

-- The gist of the separation of powers principle, rather than to limit the exercise of governmental power by allocating specific responsibilities among the three branches of government, is to ensure that "one individual may not simultaneously hold office in more than one branch of government." *Post* at 8, n 6. Thereby, the concurring justice would transform one of the pillars of our system of limited, constitutional government into the trivial (albeit probably correct) proposition that a legislator cannot at the same time serve as Director of the Department of Community Health.

-- The Michigan Constitution allows the "judicial power" to be exercised over all "disputes," and not merely "cases" or "controversies." *Post* at 14-15. Aside from the fact that the concurring justice affords absolutely no guidance on what constitutes a "dispute" or how it differs from a "case" or controversy"—although clearly it does, in her mind—she invokes no constitutional language, no constitutional history and no constitutional precedent for this blithe assertion. Indeed, in view of the fact that the Constitution apparently does not address standing at all from her perspective, why is even so much as a "dispute" required?

-- An effective substitute for the doctrine of standing are the doctrines of ripeness and mootness. *Post* at 15.

-- The state "judicial power" is different in kind from the federal "judicial power" because the latter alone applies to federal questions and diversity cases. *Post* at 12. This is simply one more *non sequitur* in the concurring opinion in search of relevance.

44

-- Federal and state standing requirements are a function of the methods by which judges are selected in these systems. *Post* at 12-13. "Everything considered, it is not surprising that the qualifications for standing in state courts are broader than in federal courts." *Id.* at 13. We are aware of nothing in their method of selection that justifies state judges in exercising the "judicial power" according to different rules and constraints than federal judges.

-- This Court, although it is barred from viewing standing as an issue of constitutional dimension, may nonetheless, in the face of a contrary legislative provision, "constrain its own power and limit standing . . . ." *Post* at 19. That is, a court may not countermand the words of the Legislature on the basis of the constitution, but it may do so on the basis of its own discretion as to when words should be ignored.

-- An institution of government is "ill-advised to curb its [own] authority under the guise of respect for another branch of government." *Post* at 20. "Ill-advised," perhaps, in an era in which governmental institutions are expected to accrete as much power as possible; not so "ill-advised" if their premise is to act within the scope of their constitutional charter.

-- Separation of powers principles "require" that the judiciary "respect" the Legislature's decision. *Post* at 20. True, although only up to a point. At least since *Marbury v Madison* anyway, the judiciary is also "required" to "respect" the constitution's decisions.

(8) Justice KELLY argues that the separation of powers provision of the Michigan Constitution should not be read in an "overly rigid" fashion. This is essentially a euphemism for the proposition that this provision should

45

not be read to mean very much of anything at all. It is hardly an "overly rigid" reading to suggest that, "No person exercising powers of one branch shall exercise powers properly belonging to another branch" means that a judge is limited to exercising the "judicial power," and not the powers of another branch. This is made *explicit* in art 6, § 1.[30]

Moreover, Justice KELLY'S understanding of the separation of powers is confused, as reflected in her citation of the dissenting opinions in *Judicial Attorneys Assoc v Michigan*, 459 Mich 291, 307; 586 NW2d 894 (1998); 228 Mich App 386, 427; 579 NW2d 378 (1998), for the proposition that the "separation of powers doctrine allows limited overlap and interaction between the branches." *Post* at 9. Of course, in pursuit of their *distinct* constitutional powers, it will often be the case that the *exercise* of separated powers overlaps. For example, it may be that the Legislature in exercising its legislative power to enact laws and appropriate monies will sometimes come into conflict with the Governor in exercising her executive

---

[30] Indeed, the fact that Justice KELLY feels impelled to articulate her "flexible" understanding of the separation of powers provision in the first place suggests an awareness that the imposition upon the judiciary of a duty to resolve non-cases and non-controversies exceeds the traditional "judicial power."

power to recommend or veto laws and appropriations. Although the separated *powers* of the legislative and executive branches do not overlap, their *exercise* often does. The separate and distinct constitutional powers of two branches may be focused on the same subject areas and the operations of state government may occasionally involve a blending of governmental operations as, for example, in the interaction between the legislative and executive branches regarding the drafting of a law or the preparation of a budget. But this is distinct from a blending of powers or functions. However much cooperation there is between the branches, the Legislature exercises only the legislative power and the executive exercises only the executive power. While the exercise of such separated powers may often overlap—this being understood generally as the realm of checks and balances—there is no "sharing" of the legislative or executive powers. There is only a sharing of the sum of all state governmental power.

(9) Justice KELLY makes much of the concepts of citizen suits and private attorneys general, yet fails to note that the history of such suits indicates that they have been brought only by individuals who have suffered an injury. This understanding continues today.

Justice KELLY correctly notes that "citizen suits" have a long pedigree in English history through relator and informers' actions. She fails to explain, however, that those who brought such actions were not strangers to the action, but possessed standing themselves either through a direct injury or through the assignation of the government's injury in fact. The historical use of such actions was explained by the US Supreme Court in *Vermont Agency of Natural Resources v United States*, 529 US 765, 774-777; 120 S Ct 1858; 146 L Ed 2d 836 (2000), using the label "qui tam" actions:

> Qui tam actions appear to have originated around the end of the 13th century, when private individuals *who had suffered injury* began bringing actions in the royal courts *on both their own and the Crown's behalf*. See, e.g., *Prior of Lewes v De Holt* (1300), reprinted in 48 Selden Society 198 (1931). Suit in this dual capacity was a device for getting their private claims into the respected royal courts, which generally entertained only matters involving the Crown's interests. See Milsom, *Trespass from Henry III to Edward III, Part III: More Special Writs and Conclusions*, 74 L Q Rev 561, 585 (1958). Starting in the 14th century, as the royal courts began to extend jurisdiction to suits involving wholly private wrongs, the common-law qui tam action gradually fell into disuse, although it seems to have remained technically available for several centuries. See 2 W Hawkins, *Pleas of the Crown* 369 (8th ed. 1824).

> At about the same time, however, Parliament began enacting statutes that explicitly provided for qui tam suits [which] allowed injured parties to sue in vindication of their own interests (as

48

well as the Crown's), see, e.g., Statute Providing a Remedy for Him Who Is Wrongfully Pursued in the Court of Admiralty, 2 Hen. IV, ch. 11 (1400). [Emphasis added.]

Accordingly, the Court held that one who brings a relator suit has standing because he is the assignee of a claim and may assert the injury-in-fact suffered by the assignor, which is normally the government. *Id.* at 773. In such cases, the Court concluded, the government's injury-in-fact suffices to confer standing on the individual relators bringing the suit. *Id.* at 774.

Similarly, a review of modern citizen suit cases almost always includes a review of standing in addition to a review of the statute that confers the right to such suits. See, e.g., *Gwaltney of Smithfield, Ltd v Chesapeake Bay Foundation*, 484 US 49, 65-66; 108 S Ct 376; 98 L Ed 2d 306 (1987). Further, like citizen suits, suits by private attorneys general do not involve those completely divorced from an injury; rather, they involve those who have suffered an injury—generally "noneconomic" injuries—and who have been provided an incentive by the legislature to bring a lawsuit to advance the public interest. See *Middlesex Co Sewerage Authority v Nat'l Sea Clammers Assoc*, 453 US 1, 17; 101 S Ct 2615; 69 L Ed 2d 435 (1981). As the United States Supreme Court noted, the point of the doctrine is that "directly *injured* victims can be counted on to

49

vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely".  *Holmes v Securities Investor Protection Corp*, 503 US 258, 269-270; 112 S Ct 1311; 117 L Ed 2d 532 (1992) (emphasis added).

Therefore, contrary to Justice KELLY'S assertions, the use of citizen suits or actions by private attorneys general does not undermine the application of traditional standing requirements.  If anything, the use of such suits *supports* the application of those requirements, as citizen suits and actions by private attorneys general have always been grounded in a private injury, whether suffered directly or as a result of an assignment by another.

(10) Justice WEAVER, referencing this Court's decision in *Preserve the Dunes v Department of Environmental Quality*, 471 Mich ____; ____ NW2d ____ (2004), derides the majority for having "unleashed an assault on MEPA this term."  *Post* at 33 n 31.[31]  However, the legal issue

_____

[31] Justice KELLY makes a similarly inappropriate, and irrelevant, connection between these cases in *Preserve the Dunes*, *supra* at 2, asserting that, despite the very different legal issues involved in these cases, and despite the fact that we reach no conclusion at all about the meaning of MEPA in the instant case, that our holdings "compound" one another.  Only, perhaps, in the sense that the concurring justice's decisions in entirely unrelated
(continued . . . .)

50

addressed in *Preserve the Dunes* has utterly *nothing* in common with the legal issue addressed in this decision, and to rhetorically equate these decisions merely because they both implicate an environmental statute suggests less a legal analysis on the part of the concurring/dissenting justice than a political statement. It is this Court's responsibility simply to uphold the law and the constitution, not to promote or impede any particular legislative cause or interest, however popular or unpopular. Rather, the obligation of this Court is simply to say what the law *is*. And that is exactly what the justices in the majority have sought to do in this case, as they have each sought to do—however imperfectly—in every case coming before this Court.

The majority cannot read the concurring/dissenting justice's conflation of wholly unrelated legal issues in a single derisive volley as anything other than implying that this Court has some obligation to decide environmental issues with an eye toward their results.[32] However, that

_____

(continued . . . .)
criminal cases, involving entirely different legal issues, "compound" one another.

[32] In the interest of perspective, we note once more that the majority has found that the plaintiffs in this case—*environmental* plaintiffs—*possess* standing to pursue their cause of action. They have prevailed. In
(continued . . . .)

the issue of standing has arisen here in the context of MEPA is, from the perspective of the majority, utterly irrelevant. The majority would be addressing this critical constitutional issue in identical terms if it had arisen in any other subject area of the law, and it would be no more of an "assault upon MEPA" than the present decision is an "assault upon MEPA."

Further, in the other case referenced, *Preserve the Dunes*, in which this same majority has also allegedly "assaulted MEPA," this Court addressed the following specific legal question—whether MEPA authorizes a collateral action to challenge the Department of Environmental Quality's decision to issue a permit under the Sand Dune Mining Act, MCL 324.63701, enacted by the Legislature, where that collateral action seeks to challenge flaws in the permitting process *unrelated* to whether the conduct involved has polluted, or will likely pollute natural resources. We can only invite the reader of the instant opinion to also read *Preserve the Dunes* to determine whether that opinion represents an "assault on MEPA," or

(continued . . . .)
identifying such standing, however, the majority has found it to exist under traditional precepts of standing and has avoided the resolution of a constitutional issue that it need not prematurely address. See n 21.

52

instead an honest and impartial effort to resolve the limited question of statutory interpretation presented in that case.

Justice WEAVER'S "assault on MEPA" rhetoric becomes even more groundless when one recognizes that she is dissatisfied with the majority for having concluded that it is *unnecessary to interpret MEPA at all* in resolving the present standing controversy. Instead, we conclude that plaintiffs possess standing on traditional grounds. Thus, in the end, the majority's "assault upon MEPA" amounts merely to the majority *refraining* from interpreting MEPA.[33]

## VII. CONCLUSION

In addressing an issue that the majority does not resolve today, Justices WEAVER and KELLY would allow the Legislature to grant plaintiffs standing in environmental lawsuits, regardless of whether any injury has been suffered. Under this view of the "judicial power," "any person," for example, could seek to enjoin "any person" from mowing his lawn with a gas-powered mower because such activity allegedly creates air pollution and uses fossil

---

[33] Despite characterizing the majority's discussion on standing in section III as "simply dicta," *post* at 3, a point with which we agree, Justice Kelly simultaneously, and perplexingly, concludes that this case "stands for the proposition" addressed in this section. *Id.* at 2.

53

fuels when other alternatives are available. "Any person" could sue "any person" for using too much fertilizer on his property, or allowing too much runoff from a feedlot on his property. "Any person" could sue "any person" from using excessive amounts of pesticides in his home or garden or farm. "Any person" could sue "any person" for improperly disposing of used petroleum-based oils. "Any person" could sue "any person" for improper backyard grilling practices, excessive use of aerosol sprays and propellants, or wasteful lawn watering.[34]

We can only assume that the concurring/dissenting justices' casualness about eliminating traditional rules of standing suggests that they are not fully aware of the world that they would create. It is a world in which any conduct allegedly affecting the environment might result in litigation if *anyone*, *anywhere*, for *any* reason, felt aggrieved. The potential for abuse under such a

---

[34] In response to Justice WEAVER's assertion that, "[a]fter more than 30 years, MEPA has not spawned an unmanageable stream of citizen-suits . . .," *post* at 28. n 30, the majority simply reiterates that there has never been a decision of this Court holding under MEPA that "any person" could sue "any person." In response to Justice KELLY, the majority simply notes that it is underwhelmed by the purported safeguards that she identifies to what she characterizes as our "parade of horribles." *Id*. at 20. It is fortunate for the people of Michigan that, at least for the time being, their freedoms and fortunes will not be dependent upon such "safeguards."

circumstance explains at least one of the practical reasons why the enforcement of regulatory laws has generally been limited to officers of the executive branch, and why, from time immemorial, standing has required an individualized injury on the part of a plaintiff. The concurring/dissenting justices would replace the judgment and discretion of the executive branch with an enhanced regime of lawsuits, a regime in which judges increasingly substitute their own views for those of the Governor, the Attorney General, and their appointees.

This Court reaffirms *Lee* and concludes that, under the circumstances of this case, plaintiffs, on behalf of their members, possess standing to pursue the instant cause of action. Thus, we affirm the decision of the Court of Appeals and remand to the trial court for proceedings consistent with this opinion.

> Stephen J. Markman
> Maura D. Corrigan
> Clifford W. Taylor
> Robert P. Young, Jr.

                    S T A T E   O F   M I C H I G A N

                           SUPREME COURT


NATIONAL WILDLIFE FEDERATION
& UPPER PENINSULA ENVIRONMENTAL
COUNCIL,

        Plaintiffs-Appellees,

v                                                      No. 121890

CLEVELAND CLIFFS IRON COMPANY
& EMPIRE IRON MINING PARTNERSHIP,

        Defendants-Appellants,

and

MICHIGAN DEPARTMENT OF ENVIRONMENTAL
QUALITY, and RUSSELL J. HARDING, Director
of the Michigan Department of
Environmental Quality,

        Defendant-Appellee

_____


WEAVER, J. (*concurring in result only*).

        I concur in only the result of the majority opinion.

I would hold that plaintiffs have standing under MCL

324.1701(1) of the Michigan environmental protection act

(MEPA) to bring an action to enjoin mining activities that

plaintiffs allege will irreparably harm natural resources.

        I dissent from the majority's analysis of "standing"

and "judicial power" because this analysis utterly ignores

the will of the people of Michigan expressed in art 4, § 52 of our Constitution that

> [t]he conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.[1]

Pursuant to this constitutional provision, the people of Michigan have required that the Legislature provide for the protection of Michigan's natural resources. The Legislature properly acted in fulfillment of its constitutional responsibility[2] through enactment of MEPA's citizen-suit provision that provides:

> The attorney general or *any person* may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources

---

[1] The majority ignores the constitutional mandate of art 4, § 52 and attempts to distract the reader with a discussion of federal standing and federal judicial power, a discussion that is irrelevant to the important questions of Michigan law presented in this case.

[2] As previously recognized by this Court, "Michigan's Environmental Protection Act marks the Legislature's response to our constitutional commitment to the 'conservation and development of the natural resources of the state.'" *Ray v Mason Co Drain Comm'r,* 393 Mich 294, 304; 224 NW2d 883 (1975) (quoting Const 1963, art 4, § 52).

from pollution, impairment, or destruction. [MCL 324.1701(1)(emphasis added).]

The majority disregards the intent of the Legislature, erodes the people's constitutional mandate, and overrules 30 years of Michigan case law that held that the Legislature meant what it said when it allowed "any person" to bring an action in circuit court to protect natural resources from actual or likely harm.[3]

In this case, this Court specifically asked the question whether the Legislature may confer standing under MCL 324.1701(1) of MEPA on persons who do not satisfy the judicial test for standing articulated by *Lee v Macomb Co Bd of Comm'rs,* 464 Mich 726; 629 NW2d 900 (2001). The majority purports to not decide this question, but it clearly implies that the Legislature's attempt to confer

---

[3] Five years after MEPA was enacted, this Court said that MEPA "provides private individuals and other legal entities with standing to maintain actions in the circuit court" to protect natural resources. *Ray, supra* at 304-305. That MEPA grants standing to "any person" has been unquestioned for over 30 years. See also, *Eyde v State of Michigan,* 393 Mich 453, 454; 225 NW2d 1 (1975), *West Michigan Environmental Action Council v Natural Resources Comm*, 405 Mich 741; 275 NW2d 538 (1979), *Kimberly Hills Neighborhood Ass'n v Dion,* 114 Mich App 495; 320 NW2d (1982), *Trout Unlimited Muskegon White River Chapter v White Cloud,* 195 Mich App 343; 489 NW2d 188 (1992), *Nemeth v Abonmarche Dev, Inc,* 457 Mich 16; 576 NW2d 641 (1998).

standing more broadly than *Lee* in MEPA *or any other statute* is unconstitutional.

Fortunately for the plaintiffs in this case the majority concludes that the plaintiffs have standing under the judge-made test articulated in *Lee*.[4] In so holding, the majority purports to exercise judicial restraint, asserting that it is preserving the "separation of powers" by not exercising the "power" conferred upon it by the Legislature under MEPA and applying *Lee's* restrictive standing test to these MEPA plaintiffs. This assertion is untrue because MEPA empowered the *people* to help protect the state's

---

[4] The majority cannot seriously dispute, ante at 25 n 19 and 32-33, that *Lee* is a "judge-made" standing test. *Lee* "supplemented" Michigan's previously prudential standing test with a test derived from federal law interpreting a federal constitutional provision that does not apply to the state. Neither the framers nor the ratifiers of the 1963 Constitution, when considering the power of the Michigan judiciary, would have anticipated supplementing Michigan's prudential standing doctrine with the constraints imported by *Lee* from art III of the federal constitution. As defined in 1 Cooley, Constitutional Limitations (8th ed) at 125, n 1:

> "Judge-made law", as the phrase is here employed, is that made by judicial decision which construe away the meanings of statutes, or find meanings in them the legislature never held. The phrase is sometimes used as meaning, simply, the law that becomes established by precedent.

Judges can as easily and with as little restraint find new meanings in constitutions that the ratifiers never intended as they can find new meanings in statutes. This is precisely the effect of the majority's decision in *Lee.*

4

natural resources, not the courts, and because the majority has in fact laid out its position on the constitutional question. Though camouflaged by the correct result, it is clear that the majority would hold that the Legislature may not grant standing more broadly than *Lee*. The majority can wait for a future case that has not drawn public attention[5] to openly and directly declare the MEPA citizen-suit standing provision unconstitutional.

The majority's application of *Lee's* judicial standing test to these plaintiffs imposes unprecedented, judge-made restrictions on MEPA plaintiffs' access to the courts. The majority's decision overrules without discussion 30 years of precedent, imposes on all future MEPA plaintiffs the burden of establishing standing under the restrictive test of *Lee*, and undermines the people's mandate expressed by

---

[5] This case has generated considerable and justifiable concern regarding whether this Court would uphold the Legislature's grant of standing that authorizes "any person," MCL 324.1701(1), to sue to protect the environment or whether the Court would declare such legislatively conferred standing unconstitutional by extending the rationale of *Lee*. Note that the State Attorney General's office on behalf of the Michigan Department of Environmental Quality, appellee before this Court, argues that the Michigan Legislature may grant standing to persons who do not meet the *Lee* standing test. Included among the many amicus opposing the extension of *Lee* is William G. Milliken, the Governor of Michigan who signed MEPA into law. Apparently, the executive branch has not and does not share the majority's fear of MEPA citizen-suits.

5

Const 1963, art 4, § 52 that the Legislature provide for the protection of Michigan's natural resources. While pretending to limit its "judicial power," the majority's application of *Lee's* judicial standing test in this case actually expands the power of the judiciary at the expense of the Legislature by undermining the Legislature's constitutional authority to enact laws that protect natural resources.

The majority's failure to adhere to MEPA's "any person" standard will have far-reaching consequences and will affect plaintiffs' access to courts in more than just the environmental arena. For example, while resolving the case on other grounds, the Court of Appeals in *Cuson v Tallmadge Charter Twp,* unpublished opinion per curiam, issued May 15, 2003 (Docket No. 234157), applied *Lee* to note that plaintiffs did not have standing under *Lee* to enjoin future violations of the Open Meetings Act, MCL 15.261 *et seq.* The panel did not address § 11(1) of that Open Meetings Act, which provides:

> If a public body is not complying with this act, the attorney general, prosecuting attorney in which the public body serves, or *a person* may commence a civil action to compel compliance or

6

to *enjoin further noncompliance with this act.*
[Emphasis added.][6]

Thus, it cannot be denied that this case concerns more than the people's constitutional mandate that the Legislature protect the environment and the Legislature's attempt through MEPA's citizen-suit provision to do so. It also concerns every statutory grant of standing that is broader than *Lee's* standing test.[7]

Consequently, while I concur with the majority's conclusion that the plaintiffs have standing to bring this action, I dissent from the majority's imposition of *Lee's* judicial standing test in this case. Further, I disagree with the majority's inappropriate suggestion, in its reliance on inapplicable federal law, that the plaintiffs' victory may be short-lived. *Ante* at 28 and 29 n 20. On

---

[6] Also see *People v Van Turbbergen,* 249 Mich App 354; 642 NW2d 368 (2002) the prosecution raised *Lee* to suggest that a criminal defendant did not have standing to challenge his arrest as being without legal authority and *Otsego Co Rural Alliance, Inc v Bagley Twp*, unpublished opinion per curiam of the Court of Appeals, issued June 19, 2003 (Docket No. 237277), in which the Court held that plaintiffs did not have standing under *Lee* to challenge the defendant's establishment of a Downtown Development Authority or a referendum by which the voters approved a contract between defendant and a utilities authority established by defendant and another township.

[7] See *ante* at 43.

7

remand, the parties' burdens of proof are well-established under MEPA.

I would conclude that the Michigan Legislature has the constitutional authority to create a cause of action and to confer standing on any person without this Supreme Court's interference through judge-made standing tests. I would further conclude that the Legislature did expressly confer standing on "any person" under MCL 324.1701(1). Therefore, I would hold that plaintiffs have standing pursuant to MCL 324.1701(1) of MEPA.

## I.   FACTS

In this case plaintiffs, the National Wildlife Federation and the Upper Peninsula Environmental Coalition, seek to enjoin defendants, Cleveland Cliffs Iron Company and Empire Iron Mining Partnership, from proceeding under a permit issued in August 2000 by the Department of Environmental Quality. Plaintiffs allege that the expansion of iron ore mining activities proposed under the permit will irreparably harm wetlands and streams.

## II.   MEPA

The people of Michigan through the 1963 Constitution expressly directed the Legislature to provide for the protection of the environment. The Constitution provides:

The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction. [1963 Const 1963, art 4, § 52.]

As part of its fulfillment of this mandatory constitutional duty, the Legislature enacted the Michigan environmental protection act (MEPA). *State Hwy Comm v Vanderkloot*, 392 Mich 159, 183; 220 NW2d 416 (1974).[8]

Having determined that "[n]ot every public agency proved to be diligent and dedicated defenders of the environment," the Legislature through MEPA "has provided a sizable share of the initiative for environmental law enforcement for that segment of society most directly affected––the public." *Ray, supra* at 305, and *Eyde, supra*. As this Court previously noted, this citizen-suit provision of MEPA "signals a dramatic change from the practice where the important task of environmental law enforcement was left to administrative agencies without the opportunity for

---

[8] MEPA is codified as part 17 of the natural resources and environment act, MCL 324.101 *et seq.*

participation of individuals or groups of citizens." *Ray, supra* at 305.

MEPA broadly defines who can sue to protect the environment by providing:

> The attorney general or *any person*[9] may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction. [MCL 324.1701(1)(emphasis added).]

This Court has explained that MEPA creates "an independent cause of action, granting standing to private individuals to maintain actions in circuit court for declaratory and other equitable relief against anyone for the protection of Michigan's environment." *Eyde, supra* at 454. Indeed, this Court has held that this language confers standing on "any person." *Ray, supra* 304-305.

---

[9] The definition of "person" in the Natural Resources and Environmental Protection Act, of which MEPA is a part applies throughout the act. MCL 324.301(g) of the act defines "person" as "an individual, partnership, corporation, association, governmental entity, or other legal entity."

10

## III. Michigan's Judicial Standing Test

Without standing, a court will not hear a person's complaint — the doors to the court are closed. Unlike other substantive rules governing access to the courts, standing rules focus on the person bringing the claim rather than the claim itself.[10] "Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue." *Sierra Club v Morton,* 405 US 727, 731-732; 925 S Ct 1361; 31 L Ed 2d 636 (1972).

In Michigan, the judicial test for standing has focused on prudential, as opposed to constitutional, concerns. *Lee, supra* at 743 (WEAVER, J. concurring); *Detroit Fire Fighters Ass'n v Detroit,* 449 Mich 629, 643; 537 NW2d 436 (1995) (RILEY, J. concurring).[11] Prudential concerns are

---

[10] In *Flast v Cohen,* 392 US 83, 102; 88 S Ct 1942; 20 L Ed 2d 947 (1968), the Court noted "in ruling on standing, it is both appropriate and necessary to look to the substantive issues . . . to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated."

[11] No Michigan case decided before *Lee* held that standing to sue in Michigan courts is a Michigan or federal constitutional question as opposed to a prudential concern. Thus the majority's allegiance to *Lee* is not allegiance to "traditional grounds" for standing. See *ante* at 53.

essentially "matters of judicial self-governance. . . ." *Warth v Seldin*, 422 US 490, 500; 95 S Ct 2197; 45 L Ed 2d 343 (1975). Before Michigan courts will hear a case, they consider whether "a party's interest in the outcome of the litigation . . . will ensure sincere and vigorous advocacy." *House Speaker v State Admin Bd*, 441 Mich 547, 554; 495 NW 2d 539 (1993). The courts further consider whether the plaintiff has demonstrated that "the plaintiff's substantial interest will be detrimentally affected in a manner distinct from the citizenry at large." Id.

In developing prudential standing rules, Michigan courts have often drawn from federal case law discussing prudential standing requirements. *Id.* at 559. Yet the federal courts are bound not only by judicially imposed prudential considerations, but also by federal constitutional limitations on standing imposed by article III of the federal constitution.[12] *Warth, supra* at 498.

---

[12] The first mention of standing as an article III limitation was in *Stark v Wickard,* 321 US 288; 64 SCt 559; 88 L Ed 733 (1944). See Sunstein, *What's Standing After* Lujan*? Of Citizens Suits, "Injuries," and Article III,* 91 Mich L R 163, 169 (1992). The majority's assertion that the founding fathers had the specific concept of standing in mind when enumerating the powers of the federal judiciary through article III is pure speculation.

Federal constitutional standing limitations involve "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of article III of the United States Constitution."  *Id.* at 498.[13]

The United States Supreme Court has made clear that article III-based constraints apply to every person who seeks to invoke federal court jurisdiction. *Bennett v Spear*, 520 US 154, 162; 117 S Ct 1154; 137 L Ed 2d 281 (1997).  However, the United States Supreme Court has also made clear that article III-based constraints are distinguishable from federal prudential constraints, because prudential constraints can be "modified or

---

[13] Art III, § 2 provides in part:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their authority;—to all cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;-to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

abrogated by Congress . . . ." *Id.*[14] Before *Lujan, supra,* the United States Supreme Court described the difference between federal constitutional and federal prudential constraints on standing in *Sierra Club, supra* at 732:

> Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a "personal stake in the outcome of the controversy," *Baker v. Carr,* 369 US 186, 204 [825 S Ct 691; 7 L Ed 2d 663 (1962)], as to ensure that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Flast v Cohen,* 392 US 83, 101. Where, however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff.

There has never been a federal case applying article III's case or controversy based standing constraints to state courts. As noted by Justice Kennedy writing for the

---

[14] Addressing the legislative standing vis-a-vis federal prudential standing constraints, Justice Scalia writing for the majority in *Bennett, supra* at 165, held that the grant of standing to "any person" under the Endangered Species Act, 16 USC 1540(g) must be taken at "face value" because "the overall subject matter of this legislation is the environment (a matter in which it is common to think that all persons have an interest) and that the obvious purpose of the provision is to encourage enforcement by so-called 'private attorneys general'. . . ."

Court in *ASARCO, Inc v Kadish*, 490 US 605, 617; 109 S Ct 2037, 104 L Ed 2d 696 (1989):

> We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justicibility . . . .

Nevertheless, because the majority incorrectly and at length insists that article III's case or controversy constraints do apply to Michigan, it is necessary to review those constraints.

For the purposes of this case, the relevant articulation of federal article III-based standing test is found in *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992).[15] In *Lujan, supra* at 560, the lead opinion of the United States Supreme Court concluded that the "irreducible constitutional minimum" for standing within the meaning of Article III's "case or controversy" limitation is as follows:

> First, the plaintiff must have suffered an "injury in fact" — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of — the injury has to

---

[15] This articulation is relevant because, as will be discussed *infra,* the majority in *Lee* "supplemented" Michigan's standing test with *Lujan's* article III-based test.

be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." [Citations omitted.]

In *Lujan,* six United States Supreme Court justices agreed that the plaintiffs had failed to demonstrate a concrete injury resulting from a lack of opportunity to consult regarding the impact of certain federally funded overseas activities on its members ability to observe endangered species on unspecified future trips abroad.[16]

---

[16] The *Lujan* lead opinion was authored by Justice Scalia and joined in whole by Chief Justice Rehnquist and Justices White and Thomas. Justice Kennedy, joined by Justice Souter, concurred separately, agreeing that respondents failed to demonstrate a concrete injury. Justice Kennedy in his concurrence did not join the part of the opinion that articulated the three element "irreducible" test, but rather based his concurrence on respondents failure to demonstrate a concrete injury that would be sufficient "under our precedents." *Lujan, supra* at 580. The *Lujan* standing test has been applied, however, in subsequent decisions of the United States Supreme Court. *See e.g. Bennett, supra* and *Friends of the Earth, Inc v Laidlaw Environmental Services (TOC), Inc*, 528 US 167; 120 S Ct 693; 145 L Ed 2d 610 (2000). Over the dissent of Justices Scalia and Thomas, the United States Supreme Court in *Laidlaw* tempered its application of the *Lujan* concrete injury requirement holding that a plaintiff's "reasonable concerns" that a defendant's conduct would affect their recreational, aesthetic, and economic interest was sufficient. Though *Laidlaw* preceded this Court's decision in *Lee,* it was not mentioned by the *Lee* majority. However, it should be noted that the majority now cites with approval the *Laidlaw* dissent of Justice Scalia. *Ante* at 29, n 20.

The *Lujan* lead opinion, with the qualified support of the concurrence, noted that "[w]e have consistently held that a plaintiff raising only a generally available grievance about government — claiming only harm to his and every citizen's interest in the proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large — does not state an article III case or controversy."  *Id.* at 573-574.[17]

Until the decision in *Lee*, it was well-understood by this Court that article III's "case or controversy" limitation was inapplicable to Michigan courts.[18]  Until *Lee,* no decision of this Court characterized standing in Michigan courts as being a constitutional question. Nonetheless, the *Lee* majority adopted *Lujan's* article III-based test, concluding vaguely that *Lujan's* test was "fundamental to standing."  *Lee, supra* at 740.  The *Lee*

---

[17] Justices Kennedy's concurrence with this portion of the lead opinion was qualified by his view that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Lujan, supra* at 580.

[18] *ASARCO, Inc, supra* at 617 and *House Speaker, supra* at 559 n 20.  See also *Lee, supra* at 743 (WEAVER, J. concurring); *Detroit Fire Fighters, supra* at 643(RILEY, J. concurring) .

majority warned that to neglect standing "would imperil the constitutional architecture whereby governmental powers are divided between the three branches of government." *Lee, supra* at 735.

Obscuring the fact that Michigan's Constitution contains no corollary to article III, §2, the *Lee* majority suggested that Michigan's standing doctrine developed on a parallel track by way of "*additional* constitutional underpinning." *Lee, supra* at 737 (emphasis added). The "additional constitutional underpinning" referenced by the *Lee* majority was Const 1963, art 6, § 1, which vests the state judicial power in the courts,[19] and Const 1963, art 3, § 2, which divides the powers of government into three branches.[20] However, the cases addressing these provisions cited by the *Lee* majority were not standing cases; rather each involved a distinct question regarding the scope of

---

[19] Const 1963, art 6, § 1 provides: "The judicial power of the state is vested exclusively in one court of justice which shall be divided into one supreme court, one court of appeals, one trial court of general jurisdiction known as the circuit court, one probate court, and courts of limited jurisdiction that the legislature may establish by a two-thirds vote of the members elected to and serving in each house."

[20] Const 1963, art 3, § 2 provides: "The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."

judicial power.[21]  In other words, the *Lee* majority incorrectly equated Michigan case law addressing unrelated issues of "judicial power" with federal case law addressing article III's "case or controversy" constraints on standing.[22]

The *Lee* majority's analysis, and its adoption of *Lujan's* article III-based standing test, laid the groundwork to question the Legislature's authority to confer standing on plaintiffs who would not survive *Lee's* test.  I continue to believe that the adoption of the *Lujan* test for standing by the *Lee* majority was unnecessary. *Lee, supra* at 744 (WEAVER, J. concurring).  Further, the majority's application of *Lee's* standing test to a case involving a constitutionally based, expressly legislated

---

[21]  The *Lee* majority cited *Sutherland v Governor*, 29 Mich 320 (1874) which held that the courts cannot issue a mandamus against the Governor; *Daniels v People*, 6 Mich 381 (1859), which held the authority to set a criminal defendant's bail was a ministerial, not a judicial act; *Risser v Hoyt*, 53 Mich 185; 18 NW 611 (1884), which held the Legislature cannot delegate judicial power to circuit judges acting in chambers as opposed to in court; *Johnson v Kramer Bros Freight Lines, Inc,* 357 Mich 254; 98 NW2d 586 (1959), which held the Legislature may delegate to the judiciary the power to determine whether good cause justified a writ of garnishment.

[22] Even the author of *Lujan's* lead opinion, Justice Scalia, recognized a distinction between article III-based standing limitations and the "merely prudential considerations that are part of judicial self-government . . . ." *Lujan, supra* at 560.

19

grant of standing demonstrates that the adoption of *Lujan* is not only unnecessary, it is wrong for Michigan. Michigan's case law addressing distinguishable issues involving the scope of judicial power before *Lee* already protected the balance of powers among Michigan's three branches of government.[23]

It is simply not true that a judge-made standing test based on a federal constitutional provision that has no corollary in Michigan would, as promised by the *Lee* majority, better preserve Michigan's "constitutional architecture." *Lee, supra at* 735. Certainly, the majority's distracting diversion into contemplations of federal law does nothing to clarify or justify its abandonment of thirty years of precedent under MEPA. Nevertheless, it is clear that *Lee* has, and the majority in this case has, constitutionalized Michigan's judicial standing test. In so doing, the majority usurps the Legislature's authority to modify or abrogate the judiciary's prudential standing constraints. It is, thus, the majority's application of *Lee's* article III-based test to this and future MEPA cases that will disrupt Michigan's

---

[23] See, e.g., Sutherland, supra; Daniels, supra; Risser, supra; Johnson, supra.

"constitutional architecture" and the legislatively conferred access to the courts.

## IV. Preserving Michigan's Constitutional Structure

Among the reasons why *Lee's* article III-based standing test or any judge-created standing test should not be applied to MEPA plaintiffs, the most important is that to do so defeats the clear, unambiguous, and readily understandable purpose of art 4, § 52 of the Michigan Constitution.[24] Through art 4, § 52, the people of Michigan directed the Legislature "to provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction." Art 4, § 52 provides that this mandate serves the people's express "paramount concern in the interest of the health, safety and general welfare of the people" specifically with respect to "the "conservation and development of the natural resources of the state." Employing the precise words of art 4, § 52, the Legislature enacted MEPA in fulfillment of art 4, § 52's mandate.

Since MEPA's enactment, this Court has held that the Michigan Legislature could confer standing under MEPA to

---

[24] See, e.g., *Mich Farm Bureau v Secretary of State,* 379 Mich 387, 393; 151 NW2d 797 (1967) (addressing principles of constitutional construction.)

21

"any person" who alleges that a defendant's conduct has or is likely to "pollute, impair or destroy the air, water or other natural resources or the public trust therein." *Ray*, *supra.* MEPA plaintiffs have not been required, until now, to overcome any judge-created standing tests to gain access to the courts.[25] It is clear that the Legislature's explicit grant of standing to "any person" under MEPA was intended to operate free from judge-made standing tests. Expanding the application of *Lee*, therefore, undermines art 4, § 52 and the Legislature's policy decisions, by restricting who may bring a MEPA action to court.

Expanding the application of *Lee's* standing test, as the majority does in this case, also infringes the Legislature's power to make laws pursuant to art 4, § 52.[26]

---

[25] MEPA requires plaintiffs to show "that the conduct of defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources . . . ." MCL 324.1703(1). The defendant may rebut a plaintiff's case by submitting evidence to the contrary or by way of an affirmative defense show "that there is no feasible and prudent alternative to defendant's conduct and that his or her conduct is consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction." *Id.*

[26] This present case is distinguishable from *Lee* because the statute at issue in *Lee* did not involve a legislated and express cause of action coupled with an unambiguous grant of standing. *Lee* addressed plaintiff's

(continued . . . .)

22

The Legislature's decision to allow "any person" to maintain a cause of action under MEPA is consistent with art 4, § 52's environmental mandate and is an exercise of legislative discretion that carries a presumption of constitutionality. *Johnson v Kramer Bros Freight Lines, Inc, supra* at 257. As duly recognized by Justice Cooley: "no court can compel the Legislature to make or to refrain from making laws, or to meet or adjourn at its command, or to take any action whatsoever, though the duty today it be made ever so clear by the constitution or the laws." *Sutherland, supra* at 326.

Through MEPA, the Legislature has given "the private citizen a sizable share of the initiative for environmental law enforcement." *Eyde, supra* at 454. Yet it is strongly implied by the majority that MEPA's citizen-suit provision unconstitutionally transfers to the judiciary the executive power to ensure that the laws are faithfully executed. This argument is unsupportable and incorrect. MEPA's citizen suit provision does not expand the power of the judiciary; it grants the power to the people of this state to pursue MEPA violations. The court's role in these cases

(continued . . . .)
standing to compel county boards of commissioners to levy a tax establishing a veteran's relief fund in accordance with the soldier's relief act, MCL 35.21 *et seq.*

23

differs in no way from any other controversy that comes before it:  the court hears the case, interprets the applicable law, and renders a decision.[27]

Moreover, the Legislature's decision to permit "any person" to sue under MEPA does not interfere with the enforcement of the law by the executive branch, it simply provides every citizen an opportunity to ensure that the laws that are designed to prevent environmental harm are enforced.  In this sense, MEPA's citizen-suit provision is consistent with the fact that, "[a]ll political power is inherent in the people.  Government is instituted for their equal benefit, security and protection."  Art 1, § 1.

Further, the majority's application of *Lee's* standing test ignores the fact that the three branches of government cannot "operate in all respects independently of the

---

[27] Similarly, the majority is mistaken that art 3, § 8, art 9, § 32, or art 11, § 5 grant "judicial power."  *Ante* at 20-21.  Art 3, § 8 grants power to the *Legislature* and the *Governor* to request an advisory opinion on the constitutionality of legislation.  Art 9, § 32 grants *any taxpayer* the ability to pursue violations of the Headlee Amendment, though this majority has recently eviscerated that broad grant of standing by applying broad judicially created principles of res judicata to preclude taxpayer claims.  See *Adair v Michigan*, 470 Mich 105; ___ NW2d ___ (June 9, 2004) (Weaver, J. dissenting in part and concurring in part.)  Finally, art 11, § 5 grants power to *any citizen* to pursue injunctive or mandamus relief for violations of the provisions.

others, and that what are called the checks and balances of government constitute each a restraint upon the rest."

*Sutherland, supra* at 325.   Justice Cooley elaborated:

> The Legislature prescribes rules of actions for the courts, and in many particulars may increase or diminish their jurisdiction; it also, in many cases, may prescribe rules for executive action, and impose duties upon, or take powers from the governor; while in turn the governor may veto legislative acts, and the courts may declare them void where they conflict with the constitution, notwithstanding, after having been passed by the Legislature, they have received the governor's approval.  But in each of these cases the action of the department which controls, modifies, or any manner influences that of another, is strictly within its own sphere, and for that reason gives no occasion for conflict, controversy or jealousy.  The Legislature in prescribing rules for the courts, is acting within its proper province in making laws, while the courts, in declining to enforce an unconstitutional law, are in like manner acting within their proper province, because they are only applying that which is law to the controversies in which they are called upon to give judgment.  It is mainly by means of these checks and balances that the officers of the several departments are kept within their jurisdiction, and if they are disregarded in any case, and power is usurped or abused, the remedy is by impeachment, and not by another department of the government attempting to correct the wrong by asserting a superior authority over that which by the constitution is equal."  [*Id.*]
> The legislative power includes the power to create new

legal rights.  And, where the Legislature chooses, it may

exercise its discretion to create and define new causes of

25

action.[28]  Unlike its federal counterpart, the jurisdiction of the Michigan Judiciary is not limited by the case or controversy limitations expressed in Article III, § 2 of the United States Constitution nor by the federal court's ever-evolving interpretation of those limitations.

Without a doubt, the constitutionality of MEPA's citizen-suit provision remains "teed up" for a future open and direct ruling that *Lee's* judicial standing test supercedes the Legislature's authority to confer standing. The majority's application of *Lee's* standing test to any person's legislatively conferred and constitutionally-based

---

[28] Art 3, § 7 provides:

> The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.

Interestingly, the majority recognized that this constitutional provision grants the Legislature the power to create a cause of action, limit or modify the cause of action, eliminate a cause of action, or take the less drastic step of limiting the damages recoverable for a particular cause of action. *Phillips v Mirac, Inc,* 470 Mich 415; __ NW2d __ (2004) (opinion of TAYLOR, J.). Art 3, § 7 is an additional constitutional basis for concluding the Legislature has the authority to define who has standing to pursue a cause of action that it creates and defines. By concluding to the contrary in this case, the majority violates the separation of powers defined in the Michigan Constitution by allowing judge-made standing tests to usurp legislative policy decisions.

standing under MEPA improperly enlarges the court's power at the expense of the Legislature's power, ironically violating the very "constitutional architecture" the majority purported to protect in *Lee*.[29]

V.  Plaintiffs have standing under MCL 324.1701(1)

The circuit court concluded that plaintiffs lack standing to sue under MEPA in light of *Lee*. To reach this conclusion, that court reviewed affidavits of members of plaintiff organizations and made the following comments from the bench:

> They were concerned about this, they were concerned about that, they were concerned that there might not be as many birds around Goose Lake as there used to be. And I'm not going to take the time to go through the affidavits one by one, but I think that anybody who reads them will see how often the words or the phrases "I am concerned" without any stated basis in those affidavits for the reason for being concerned. I am concerned that there will be an impact, I am concerned that there has been a diminishment of the fishery in Goose Lake, and I'm concerned that the mining activities will further diminish the fishery. That's not enough.

---

[29] With regard to the balance of governmental powers, it is worth noting that because the current majority would interpret the power of the Michigan court as limited by the Art III, § 2 of the federal constitution, it has freed itself to impose restrictions on access to Michigan courts beyond those of the Legislature. Moreover, no other branch of government can check or balance the majority's exercise of its improperly assumed power.

Plaintiffs appealed and the Court of Appeals reversed. The Court of Appeals reviewed the plain language of MEPA and, citing *Ray,* correctly held that plaintiffs have standing. The Court of Appeals stated that it "declined defendants' invitation to read an additional requirement of compliance with non-statutory standing prerequisites," i.e. judge-made standing tests. Unpublished memorandum opinion, issued June 11, 2002 (Docket No. 232706). In a footnote, the Court of Appeals aptly commented that it found no indication in *Lee* that this Court intended to overrule *Ray* and noted that the statute at issue in *Lee* could be distinguished because it did not "contain a provision expressly authorizing any person to maintain an action for violations or omissions of the act." Slip op at 2.

I agree with the Court of Appeals that plaintiffs have standing under MEPA. Consistent with the people's mandate in art 4, § 52, the Legislature has determined that actual or threatened pollution, impairment, or destruction of natural resources is an injury that any person may seek to enjoin in circuit court. MCL 324.1701(1). In this case, plaintiffs have alleged that the defendant's proposed mining will harm natural resources. This is sufficient under MEPA to allow the plaintiffs their day in court.

28

Once in the door, plaintiffs must next establish their prima facie case as required by MCL 324.1703(1).[30]

## VI. Decoding the Majority Opinion

The Legislature's grant of standing to "any person" in MCL 324.1701(1) is unquestionably broader than *Lee's* judge-made standing test. The majority retains its firm belief that *Lee's* standing test is grounded in the constitutional separation of powers. By repeatedly asserting that the Legislature may not confer standing more broadly than *Lee,* the majority has impliedly decided the very constitutional question they accuse this dissent of improperly reaching. It appears that, from the majority's mistaken perspective, the MEPA's citizen-suit provision is unconstitutional because the Legislature's attempt to confer standing on "any person" under MEPA violates the separations of powers.

Moreover, it is the majority who, in *Lee,* created the constitutional dilemma that must be resolved in this case. As previously discussed, *Lee* unnecessarily imported the

---

[30] The realities of a MEPA citizen-suit must not be forgotten. Plaintiffs must establish their prima facie case, can receive only declaratory and equitable relief (not money damages), and may be required to bear their own costs. MCL 324.1703 and MCL 324.1701. After more than 30 years, MEPA has not spawned an unmanageable stream of citizen-suits so feared and anticipated by the majority. *Ante* at 54-55.

federal constitution's article III case or controversy constraints on standing into Michigan law. It should also be noted that in *Lee,* the parties had not raised or briefed the applicability of *Lujan* or article III of the federal constitution. On its own initiative, the *Lee* majority raised *Lujan's* standing test and transformed standing in Michigan into a constitutional question.

I fundamentally disagree with the majority's perception of judicial discipline and duty. It is not necessarily evidence of judicial discipline to dodge the ultimate issue in a case, be the issue of constitutional dimension or not. Nor is it disciplined to import into Michigan law federal constitutional constraints that the people — the ratifiers of the Michigan Constitution — have not adopted. Moreover, where the Court specifically requests that an issue be briefed (as this Court did in this case) and the issue is squarely presented, dodging the question destabilizes the law. It is particularly inappropriate where the parties must bear the cost of further unnecessary litigation or where the decision creates confusion for the bench and the bar. In this case, it is a proper exercise of judicial duty and power to answer the constitutional question presented by this Court

regarding whether *Lee's* judge-made standing test supercedes the Legislature's authority to confer standing.

Further, while purporting to act with judicial restraint by leaving the constitutionality of MCL 324.1701(1) in doubt, the majority attempts to chart a course for the resolution of issues not even before the Court by suggesting that plaintiffs may not simply rely on the affidavits to prove that standing exists. *Ante* at 28. The majority confuses the issue of standing with a court's subject-matter jurisdiction. *Ante* at 28. The majority erroneously suggests that the circuit court can reverse this Court's unanimous decision that plaintiffs have standing. *Id.* However, this Court's decision that plaintiffs have standing controls that issue.

The majority then hints that plaintiffs' affidavits may be insufficient either to survive a motion for summary disposition or to meet the plaintiff's burden of proof. For this, the majority cites an irrelevant and nonbinding United States Supreme Court dissenting opinion in a federal case involving federal law. The plain language of MEPA and this Court's own MEPA decisions are a far more appropriate guide for the circuit court on remand.

MEPA instructs:

31

When the plaintiff has made a prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative to defendant's conduct and that his or her conduct is consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction. Except as to the affirmative defense, the principles of burden of proof and weight of the evidence generally applicable in civil actions in the circuit courts brought under this part. [MCL 324.1703(1).]

As this Court previously held,

the necessary showing to establish a plaintiff's prima facie case is not "not restricted to actual environmental degradation but also encompasses probable damage to the environment as well." General rules of evidence govern this inquiry, and a plaintiff has established a prima facie case when his case is sufficient to withstand a motion by the defendant that the judge direct a verdict in the defendant's favor. [*Nemeth v Abonmarche Dev, Inc,* 457 Mich 16, 25; 576 NW2d 641 (1998) (citations omitted).]

This Court has emphasized that MEPA's, "very efficacy . . . will turn on how well circuit court judges meet their responsibility for giving vitality and meaning to the act through detailed findings of fact." *Ray, supra* at 307-308.

VII. Conclusion

32

The majority decision in this case illustrates how judicial activism can be disguised as judicial restraint.[31] Purporting to be concerned about the separation of powers, the majority, in actuality, uses its judicial power to undermine the Legislature's proper exercise of its authority to create a cause of action and define who can pursue that action in court. The clear implication of the majority's constitutional rhetoric combined with its application of *Lee's* standing test to these plaintiffs is that the majority will not yield to any grant of standing by the Legislature that is broader than the majority's own judge-made test. The majority's decision destabilizes the law and overrules 30 years of precedent. See *supra* at 3 n 3. The majority decision forces future MEPA plaintiffs to establish that an actual or threatened environmental harm has actually injured or will imminently injure them concretely, that such injury is traceable to the defendant, or that such injury is redressable as required by the

---

[31] Indeed, the majority has unleashed an assault on MEPA this term. In this case, the majority applies *Lee's* restrictive standing test to MEPA plaintiffs and leaves the future of the more permissive legislatively conferred standing in doubt. By its decision in the *Preserve the Dunes v Dep't of Environmental Quality*, ___ Mich ___; ___ NW2d ___ (2004), the same majority insulates an illegal sand dune mining permit from scrutiny under MEPA, thereby sanctioning the destruction of critical dunes.

majority opinion in *Lee, supra* at 739-740, or risk being kicked out of court for lack of standing. Thus, any characterization of the majority's application of *Lee's* judicial standing test as a narrower ground to resolve this case is judicial gymnastics or gamesmanship, not an example of true judicial restraint.

The people through Michigan's Constitution required the Legislature to pass laws to protect the environment. Art 4, § 52. MEPA and its citizen-suit provision properly implements the constitution's directive. *State Hwy Comm, supra* at 184. *Lee's* more restrictive judge-made standing test should not be imposed on plaintiffs by the majority in this case. Rather, the "any person" standard clearly expressed by the Legislature through MEPA should be applied. To suggest or hold otherwise violates the separation of powers by allowing the judiciary to supercede the Legislature's grant of standing to "any person" under MEPA.

I, therefore, concur only in the majority's result that plaintiffs have standing. I would hold that plaintiffs have standing under MCL 324.1701(1) of the Michigan environmental protection act. I, therefore, dissent from all the majority's reasoning.

Elizabeth A. Weaver

34

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

NATIONAL WILDLIFE FEDERATION
& UPPER PENINSULA ENVIRONMENTAL
COUNCIL,

    Plaintiffs-Appellees,

v                                           No. 121890

CLEVELAND CLIFFS IRON COMPANY
& EMPIRE IRON MINING PARTNERSHIP,

    Defendants-Appellants,

and

MICHIGAN DEPARTMENT OF ENVIRONMENTAL
QUALITY, and RUSSEL J. HARDING, Director
Of the Michigan Department of
Environmental Quality,

    Defendant-Appellee.

_____

CAVANAGH, J. (concurring in result).

I agree with the result reached by the majority and Justice Weaver, but write separately to acknowledge my change in position since this Court decided *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001). In that case, I signed Justice Kelly's dissent, which agreed with the majority's adoption of *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992), as the

test for standing in this state.   I now disavow that position for the reasons expressed in Justice Weaver's opinion in *Lee,* as well as her concurrence in this case. *Lujan* should not be used to determine standing in this state.

Thus, I concur with the result reached by the majority and the reasoning espoused by Justice Weaver.

Michael F. Cavanagh

STATE OF MICHIGAN

SUPREME COURT

NATIONAL WILDLIFE FEDERATION
and UPPER PENINSULA ENVIRONMENTAL
COUNCIL,

    Plaintiffs-Appellees,

v                                 No. 121890

CLEVELAND CLIFFS IRON COMPANY
and EMPIRE IRON MINING PARTNERSHIP,

    Defendants-Appellants,

and

MICHIGAN DEPARTMENT OF ENVIRONMENTAL
QUALITY, and RUSSEL J. HARDING, Director
of the Michigan Department of
Environmental Quality,

    Defendant-Appellee.

_____

KELLY, J. (*concurring in result only*).

    I agree with the opinion of Justice Weaver and with the result reached by the majority.

    The Court concludes that plaintiffs have standing and that they satisfy the judicial test that was adopted in *Lee v Macomb Co Bd of Comm'rs,* 464 Mich 726, 747; 629 NW2d 900 (2001) (Kelly, J., dissenting). The concurring justices believe that this Court should not have adopted the test in

*Lee,* which incorporates the *Lujan* requirements.[1] I believe that *Lee* should not be applied in cases like this one.

The majority disagrees. Consequently, this case stands for the proposition that an individual bringing suit under the Michigan environmental protection act (MEPA) must show a particularized injury to satisfy standing.

However, the majority goes on at great length to assert that the standing provision in MEPA would violate the constitutional separation of powers clause absent a particularized injury. The Court's determination on standing renders the majority's discourse on the separation

---

[1] *Lee* adopted the United States Supreme Court requirements of *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992). *Lujan* requires a plaintiff seeking standing to establish an actual or imminent injury to his or her legal rights that is concrete and particularized. There must be a causal connection between the defendant's action and the plaintiff's injury, and the injury must be one for which the court can grant redress. *Lee* at 739-740, quoting *Lujan* at 560-561. I have come to believe that *Lee* wrongly adopted *en toto* the federal standing requirements. As Justice Weaver notes, the *Lujan* standing test was not presented by the parties. Also, the statute at issue in *Lee* differed from the statute under consideration here in one important respect: it lacked a provision expressly authorizing an individual to maintain an action for a violation of the act without having suffered a particularized injury. Here the standing issue has been fully presented and discussed. Moreover, I do not believe that rejecting the *Lujan* requirements now would work any unfairness that would mandate their continuing retention in Michigan. *Murray v Beyer Mem Hosp*, 409 Mich 217, 222-223; 293 NW2d 341 (1980).

of powers doctrine unnecessary. This discourse is simply dicta. Moreover, it departs from the Court's usual allegiance to the principle that we do not reach a constitutional question when narrower grounds will suffice to resolve an issue. *J & J Constr Co v Bricklayers & Allied Craftsmen, Local 1*, 468 Mich 722; 664 NW2d 728 (2003).

If a decision were necessary about whether, absent the showing of a particularized injury, MEPA's standing provision violates the separation of powers doctrine, I would hold that it does not. The Legislature has the authority to grant standing to a party who does not satisfy the judge-made standing requirements of *Lujan*. *Lee* wrongly held that the federal requirements are prerequisites that every plaintiff must satisfy.

STANDARD OF REVIEW

We review motions for summary disposition de novo. *Hazle v Ford Motor Co*, 464 Mich 456, 461; 628 NW2d 515 (2001). Whether plaintiffs have standing is a question of law that is also reviewed de novo. *Cardinal Mooney High School v Michigan High School Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991). When considering a ruling on a motion for summary disposition under MCR 2.116(C)(8), we look only at the pleadings and accept as true all well-

3

pleaded facts. *Radtke v Everett*, 442 Mich 368, 373; 501 NW2d 155 (1993), citing *Abel v Eli Lilly & Co*, 418 Mich 311, 324; 343 NW2d 164 (1984).

### PROCEEDINGS BELOW

The Marquette Circuit Court applied *Lee* and dismissed this lawsuit finding that plaintiffs failed to demonstrate that they had standing.[2] The Court of Appeals disagreed and reinstated the claim, holding that plaintiffs have standing under MEPA. Unpublished memorandum opinion of the Court of Appeals, issued June 11, 2002 (Docket No. 232706). We granted leave to appeal specifically limited to the issue "whether the Legislature can by statute confer standing on a party who does not satisfy the judicial test for standing" that was adopted in *Lee.* 468 Mich 941 (2003).

### The Legislature May Confer Rights Enforceable through the Power of the Judiciary

The Michigan environmental protection act explicitly recognizes the right of "any person" to bring suit in Michigan courts to protect the public trust in our land, water, and other natural resources. The Legislature

---

[2] Defendants' motion to dismiss plaintiffs' petition for interlocutory review was brought under MCR 2.116(C)(8). Although the circuit court found that plaintiffs had failed to establish a prima facie case, the order dismissed the case solely for lack of standing.

4

accomplished this by writing broad standing into the act, supplementing the state's enforcement power with what has been termed "private [a]ttorneys [g]eneral." *Associated Industries of NY State v Ickes*, 134 F2d 694, 704 (CA 2, 1943). As the beneficiaries of that trust, each of us is entitled to bring suit to conserve our environment.

The act fulfills a state constitutional obligation. *Hwy Comm v Vanderkloot,* 392 Mich 159; 220 NW2d 416 (1974). It springs from Const 1963, art 4, § 52 which provides:

> The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.

Intentionally mirroring this language in the act, the Legislature wrote: "any person may maintain an action . . . for declaratory and equitable relief . . . for the protection of the air, water, and other natural resources" of the state. MCL 324.1701(1).

Its decision to open wide the courthouse doors through the act's standing provision merely returns to the people some of the power to ensure that environmental laws are executed. Const 1963, art 1, § 1. The courts should acknowledge and respect this provision as a clear

5

expression of legislative intent. *Dressel v Ameribank,* 468 Mich 557, 562; 664 NW2d 151 (2003).

### Michigan's Use of Private Attorneys General

When interpreting the Constitution, we give its words their common understanding. We assume that they were not intended to have "elaborate shades of meaning" or to require, in order to be understood, "the exercise of philosophical acuteness or judicial research." *Michigan Farm Bureau v Secretary of State,* 379 Mich 387, 391; 151 NW2d 797 (1967), quoting 1 Story, Constitution (5th ed), § 451, p 345.

We are mindful that the people expect and are entitled that their constitutional rights not be hobbled by the courts. With regard to art 4, § 52, the people may reasonably depend that the courts will not thwart the Legislature's efforts to fulfill its mandate to protect our public's trust in Michigan's natural resources. We must not import requirements for access to the courts that are not founded on our Constitution. Yet the majority has created one such requirement by adopting the *Lujan* "case" and "controversy" rule.

Before *Lee*, other provisions in our state Constitution allowed suits to be brought in state courts by parties who do not satisfy the *Lujan* requirements. For example, art

11, § 5 allows "any citizen" to seek an injunction to enforce its provisions. The Headlee Amendment states, "*Any taxpayer of the state shall have standing* to bring suit in the Michigan Court of Appeals to enforce sections 25 through 31"[3] of article 9.  Const 1963, art 9, § 32 (emphasis added).  This Court may issue advisory opinions.[4] A particularized injury need not be demonstrated in order to sustain suits under these provisions.  See *In re Request for Advisory Opinion on Constitutionality of 1997 PA 108,* 402 Mich 83; 260 NW2d 436 (1977).[5]

And citizens' suits have long been accepted in our jurisprudence.  They, along with other actions brought by a person who lacks an individualized injury, were known to the framers of the federal constitution.  They existed in the legal practice in the United States and England when the federal constitution was written.  Individuals were allowed, also, to bring suits for writs of quo warranto and mandamus.  Sunstein, *What's Standing After* Lujan? *Of Citizens Suits, "Injuries," and Article III*, 91 Mich L R

---

[3] These sections address the state's power to tax and spend.

[4] Const 1963, art 3, § 8.

[5] The inference that I draw from these provisions is that the state's judicial power is broad.  The majority draws the opposite inference.  See *ante* at 21 n 13.

163, 170 (1992).  Individuals were allowed, also, to bring mandamus actions in the states.  See Sunstein at 171.  See also *Union Pacific Railroad v Hall*, 91 US 343 (1875).

In England, suits by individuals, private attorneys general, could be brought under the informers' action and the relator action.

> In the informers' action, cash bounties were awarded to strangers who successfully prosecuted illegal conduct. In relator actions, suits would be brought formally in the name of the Attorney General, but at the instance of a private person, often a stranger.  [Sunstein at 172.]

Merely because the framers of our state Constitution created a tripartite government like the federal government, it does not follow that they intended to eliminate actions by private attorneys general.

### The Separation of Powers Argument

The state separation of powers doctrine reads simply:

> The powers of government are divided into three branches: legislative, executive and judicial.  No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.[6] [Const 1963, art 3, § 2.]

---

[6] The most obvious meaning of this sentence is that one individual may not simultaneously hold office in more than one branch of government.  See Lutz, *Popular Consent and Popular Control: Whig Political Theory in the Early State Constitutions,* (Baton Rouge:  La State U Press, 1980) 96. The federal constitution does not contain this prohibition.

(continued . . . .)

It has been understood that this provision is not to be applied in an overly rigid fashion. Some overlap is acknowledged to exist in the functioning of the various branches. The state Constitution permits it. For instance, a civil rights commission within the executive branch is vested with some lawmaking power. Const 1963, art 5, § 29. Article 4, § 33 provides the Governor with veto power over legislation, and art 11, § 7 provides the Legislature with impeachment authority. Indeed, any grant of legislative powers to executive agencies would be unconstitutional per se if some overlap between the branches of government were not permissible. See *JW Hampton, Jr, & Co v United States*, 276 US 394; 48 S Ct 348; 72 L Ed 624 (1928).

The courts, also, have recognized that the separation of powers doctrine allows limited overlap and interaction between the branches. *Soap & Detergent Ass'n v Natural Resources Comm,* 415 Mich 728, 752; 330 NW2d 346 (1982). See also *Judicial Attorneys Ass'n v Michigan,* 459 Mich 291, 315-316; 586 NW2d 894 (1998) (Taylor, J., dissenting), citing the Court of Appeals dissent of Judge Markman.

---

(continued . . . .)
See *O'Donaghue v United States,* 289 US 516; 53 S Ct 740; 77 L Ed 1356 (1933).

Accordingly, when one branch exercises its power, it may overlap the exercise of power belonging to another branch. For example, the executive branch may utilize hearing officers to attempt to resolve disputes. The Judiciary may review the decisions of those hearing officers, although doing so may appear to infringe on the executive branch's exercise of its power to administer the law.[7]

The majority in *Lee* applied the federal separation of powers and standing doctrines to the state and created a mandatory particularized injury requirement for standing. This requirement is not found in the text of either the federal or state constitutions. To exist, it had to be gleaned from the historical context of the constitutions. However, a plumbing of that context reveals no support for a belief that a person must show a particularized injury before gaining standing in order to bring a citizens' suit. See pp 7-8 of this opinion.

Even though the federal separation of powers doctrine has been found to require a particularized injury for standing in federal courts, it does not follow that the

---

[7] To say as the majority does that the powers of the three branches do not overlap while the exercise of their respective powers may, *ante* at 47, is a semantic distinction lacking a difference.

same rule applies in Michigan. Our state's courts are not identical to our federal courts. They are part of a government having broader powers and broader jurisdiction than the federal government and having judges who are selected by the people.

Although the state and federal governments are similarly structured, the scope of the powers of their respective branches is different. That is because the natures of the two governments are inherently different. The federal government is one of enumerated powers. The states retain any powers not expressly ceded to the federal government. US Const, Am X.

State sovereignty to address any social problem that threatens the public welfare is plenary. *Washington-Detroit Theatre Co v Moore,* 249 Mich 673, 680; 229 NW 618 (1930). Michigan's Constitution, like that of many other states,[8] includes detailed substantive social and economic provisions. See, e.g., articles 8-10 on Education, Finance and Taxation, and Property. Accordingly, the power of the state's judiciary is plenary as well, and Michigan's courts

---

[8] Hershkoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function,* 114 Harv L Rev 1833, 1855 n 116 (2001).

have general, broad subject-matter jurisdiction.   Const
1963, art 6, § 1.   See MCL 600.775.

By contrast, the jurisdiction of federal courts[9] is
limited.   For instance, a federal case must arise under a
federal question or the parties must have diversity of
citizenship.   Federal judicial power is limited to "cases"
and "controversies," a fundamental restriction.   *Allen v
Wright,* 468 US 737, 750; 104 S Ct 3315; 82 L Ed 2d 556
(1984).   Contrary to the majority's assertion,[10] I do not
argue that this restriction defines the judicial power.
Instead, it limits federal courts' utilization of the
judicial power to certain disputes.   By contrast, the
judicial power inherent in Michigan's courts may be applied
under a wider range of circumstances.

The federal standing and separation of powers
doctrines adopted by *Lee* from *Lujan* are predicated in part
also on the fact that federal judges are not directly
accountable to the people.   *United States v Richardson,* 418
US 166, 180; 94 S Ct 2940; 41 L Ed 2d 678 (1974) (Powell,
J., *concurring*).   Federal judges are appointed by the

---

[9] See US Const, art III, § 2.

[10] *Ante* at 23-24.

President[11] and may be removed only by impeachment.[12] By contrast, our state judges are elected by the people.[13]

The United States Supreme Court has recognized that access to state courts is not limited by the federal constitution. *ASARCO, Inc v Kadish*, 490 US 605, 616-617; 109 S Ct 2037; 104 L Ed 2d 696 (1989). Everything considered, it is not surprising that the qualifications for standing in state courts are broader than in federal courts.

Other states have determined that their judicial power is not constrained by the federal model. For example, Indiana has held:

> While Article III of the United States Constitution limits the jurisdiction of federal courts to actual cases and controversies, the Indiana Constitution does not contain any similar restraint. Thus, although moot cases are usually dismissed, Indiana courts have long recognized . . . an exception to the general rule when the case involves questions of "great public interest." [*In re Lawrance*, 579 NE2d 32, 37 (Ind, 1991).]

Similarly, Minnesota has recognized that federal standing concerns historically have been related to whether a dispute brought for adjudication is in an adversary

---

[11] US Const, art II, § 2.

[12] US Const, art III, § 1 and art II, § 4.

[13] Const 1963, Art 6, §§ 2, 8, 12, 16.

context and is capable of judicial resolution. However, when standing has been conferred by a state statute, "there is no constitutional basis for imposing a more stringent standing requirement [than that] which is set by the governing statute." *Minnesota Pub Interest Research Group v Minnesota Dep't of Labor & Industry*, 311 Minn 65, 73; 249 NW2d 437 (1976) citing *Ass'n of Data Processing Service Organizations, Inc v Camp*, 397 US 150, 151; 90 S Ct 827; 25 L Ed 2d 184 (1970). See also *Dep't of Revenue v Kuhnlein*, 646 So 2d 717 (Fla, 1994), *Chester Co Housing Auth v Pennsylvania State Civil Service Comm*, 556 Pa 621; 730 A2d 935 (1999), *In Life of the Land v Land Use Comm*, 63 Hawaii 166; 623 P2d 431 (1981), and *Sears v Hull*, 192 Ariz 65; 961 P2d 1013 (1998).

Of course, this is not to say that, before *Lee*, Michigan was without standing requirements. Simply, they were more encompassing than the federal requirements. To have standing in Michigan courts, a person had to show the existence of a dispute over a legal right. *Daniels v People*, 6 Mich 381, 388 (1859). See Sunstein at 170. The

necessary showing did not need to rise to the level of a "case" or "controversy."[14]

Our state has relied on other requirements which also serve to ensure that standing is not too broadly applied. For example, the ripeness requirement ensures that a claim has actually arisen and that it has not been negated. *Obenauer v Solomon*, 151 Mich 570; 115 NW 696 (1908). The requirement that the case not be moot ensures that it does not present a purely abstract question and that only actual disputes are litigated. *East Grand Rapids School Dist v Kent Co Tax Allocation Bd*, 415 Mich 381, 390; 330 NW2d 7 (1982). See p 17 of this opinion.

I believe that our state's standing provisions before *Lee* sufficiently ensured that judicial power was properly constrained while allowing vigorously pursued suits to proceed. The decision in *Lee* wrongly blocked access to our state's courts.

Hence, contrary to the majority's assertion, *Lee*'s standing requirements are not essential to prevent the

---

[14] When the majority characterizes "cases" and "controversies" as synonymous with "disputes," *ante* at 7, it is mistaken. See *Lujan* at 560. Notably, the majority produces no authority for this proposition. Clearly, "case" and "controversy" have specific meanings. *Id.*

judicial branch from overpowering the legislative branch and the executive branch.

### THE SEPARATION OF POWERS DOCTRINE AND MEPA

Turning to the interplay between the Michigan environmental protection act and the separation of powers clause, I cannot conclude that the act offends the clause.

Separation of powers principles ensure that courts do not move beyond the area of judicial expertise and that political questions are not answered by a branch of government unaccountable to the people. *House Speaker v Governor*, 443 Mich 560, 574; 506 NW2d 190 (1993). I am unable to discern how MEPA's private attorneys general standing provision will offend these principles. The Legislature made the public's interest in the environment a legal right.[15] It is authorized to determine who may enforce such rights and in what manner. *Davis v Passman,* 442 US 228, 241; 99 S Ct 2264; 60 L Ed 2d 846 (1979).

MEPA is an expression of public concern for protecting the state's natural resources that was passed into law through the normal political process. It reflects the

---

[15] An inherent Legislative power is to create legal rights enforceable through the judiciary and define chains of legal causation. See *Lujan* at 578; 580 (Kennedy, J., concurring).

16

determination that the resources of the executive branch should be supplemented with those of the people. The majority today threatens to diminish the victory signified by its passage.

MEPA does not enable the judiciary to exercise legislative power at the instigation of a disinterested plaintiff. The structure of MEPA ensures that the plaintiffs are not mere interlopers. The act requires a plaintiff to make a prima facie showing of environmental damage. MCL 324.1703. Hence, there will always be alleged actual or imminent harm that will ensure that cases like this one will be ripe and that they will not be moot. See pp 15 of this opinion.

This case presents one such actual, live controversy. The defendants' mine expansion is imminent. Plaintiffs' membership includes people who live and recreate in the area of the mine and claim to be adversely affected by its expansion.

Environmental and other collective concerns often have strong personal manifestations, called "passive use" or "standby value" interests. See, e.g., *General Electric Co v United States Dep't of Commerce,* 327 US App DC 33, 38; 128 F3d 767 (1997). These interests ensure that

environmental suits are vigorously pursued by people with a strong personal belief in their claim.

I cannot perceive that the judiciary would be enabled to make policy by this Court's affirmance of the constitutionality of MEPA's standing provision without the need for particularized injury. *Sutherland v Governor,* 29 Mich 320, 324 (1874).

Neither does MEPA offend executive authority. The Constitution states that "The executive power is vested in the governor." Const 1964, art V, § 1. However, it is not vested solely in the Governor. Obviously, the Governor may delegate some of her power. As stated, the Legislature may vest some of its power in an agency. Similarly, the Legislature may return it to the people. The people know how to vest power exclusively in a single branch of government. For example, our Constitution says, "The judicial power is vested *exclusively* in one court of justice." Const 1963, art VI, § 1 (emphasis added).

The Legislature's decision to allow the people to directly enforce MEPA would offend the executive branch if it interfered with the executive branch's ability to accomplish its functions. *Nixon v Administrator of Gen Services*, 433 US 425, 443; 97 S Ct 2777; 53 L Ed 2d 867 (1977), citing *United States v Nixon,* 418 US 683, 711-712;

18

94 S Ct 3090; 41 L Ed 2d 1039 (1974). MEPA does not do this.

MEPA includes a mechanism to ensure that executive branch decisions are respected. It allows the judiciary to refer environmental protection act cases to state agencies for resolution. MCL 324.1704(2). MEPA is explicitly "supplementary to existing administrative and regulatory procedures as provided by law." MCL 324.1706. Nothing in it encourages or authorizes the judiciary to itself exercise executive power or hinders the discretion of the executive branch. MEPA poses no danger of "aggrandizement or encroachment" of power that would trigger separation of powers concerns. *Mistretta v United States*, 488 US 361, 382; 109 S Ct 647; 102 L Ed 2d 714 (1989).

The New Judge-Made Standing Limitation

Obviously, this Court is entitled to constrain its own power and limit standing as it has done in this case. But in doing so, it creates a self-inflicted wound. See *Warth v Seldin,* 422 US 490, 500; 95 S Ct 2197; 45 L Ed 2d 343 (1975). No constitution requires it. *People v Goldston*, 470 Mich ___, ___; ___ NW2d ___ (2004). It is an entirely judge-made limitation, a standing requirement fabricated by judges where none existed before. And, because it subverts

19

the popular will, it injures more than the judicial branch. It injures the people.

The Court is ill-advised to curb its authority under the guise of respect for another branch of government. Its decision today is an unwarranted contraction of the right of the people to use the judicial and the legislative power to protect their interest in preserving the environment. It is not, as the majority asserts, a prudent check on an attempted expansion of legislative power. *Ante* at 9-11.

MEPA does not violate constitutional separation of powers principles despite the fact that it lacks a particularized injury requirement. These principles require that the judiciary respect the Legislature's decision and fulfill its role to adjudicate disputes as a co-equal branch of the state's government.

The majority advances a parade of horribles[16] that it fears would emerge if MEPA's standing provision were not supplemented by the *Lujan* standing requirements.[17] When

---

[16] For a similar demonstration of this majority's proclivity for doomsday prophesy, see its conclusion in *Preserve the Dunes v Dep't of Environmental Quality*, ___ Mich ___; ___ NW2d ___ (2004). I note that there, I would have respected the will of the people to enjoin critical dune mining by ineligible entities. The majority should have done likewise. See *ante* at 38 n 25.

[17] See *ante* 54-55.

examined closely, the horribles tend to shrink. Under MEPA, a plaintiff must establish prima facie environmental harm sufficient to support a claim. See MCL 324.1703(1) and *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16; 576 NW2d 641 (1998); MCR 2.116(C)(8), (10). Moreover, existing court rules deter frivolous suits. See MCR 2.114 and MRPC 3.1 and 3.3.

It is improper to hold the plaintiffs in this case to the *Lujan* judicial test for standing. Given that the express will of the people is to the contrary, plaintiffs now and in the future should not have to shoulder the *Lujan* standing burden in MEPA cases.

CONCLUSION

I agree with the opinion of Justice Weaver and with the result reached by the majority. Plaintiffs have standing. The authority of the Legislature to give the people a legal right to protect their interest in the environment through private attorneys general should not be abridged.

I would find that the Michigan Legislature did not violate the state Constitution by granting standing under MEPA to a party who does not satisfy the judicially crafted *Lee* test. The applicable test here, the MEPA test, was carefully devised by the Legislature. Because it gave

standing to "any person," I believe that any person should be able to avail himself of that law.  The Court of Appeals decision and analysis should be affirmed and the case remanded to the circuit court for trial.

                                    Marilyn Kelly
                                    Michael F. Cavanagh